

# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT



| | |
|---|---|
| NICOLE WOODS, BY AND THROUGH HER MOTHER AND NEXT FRIEND, TRISHA PIDGEON, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) CIVIL ACTION NO. *1:03-CV-05* |
| VERMONT CENTER FOR THE DEAF & HARD OF HEARING, INC. d/b/a THE AUSTINE SCHOOL FOR THE DEAF, | ) ) ) ) |
| Defendant. | ) ) |

## <u>COMPLAINT AND JURY DEMAND</u>

Nicole Woods, by and through her Mother and Next Friend, Trisha Pidgeon, commences this action against the Defendant, Vermont Center for the Deaf & Hard of Hearing, Inc., d/b/a Austine for the Deaf, seeking the entry of judgment under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), as well as under theories of direct and vicarious liability based upon the physical abuse, sexual molestation and harassment of Nicole Woods, a then-8-year-old deaf student at the school, by her one-on-one aide who was later promoted to "behavioral support specialist" at the school.



## PARTIES, JURISDICTION AND VENUE

1.      Nicole Woods ("Nicole") is an individual residing at 469 E. Street, Waterbury, VT. Nicole is currently thirteen (13) years old.

2.      Trisha Pidgeon is Nicole's mother and is an individual residing at 469 E. Street, Waterbury, VT.

3.      Defendant Vermont Center for the Deaf & Hard of Hearing, Inc., d/b/a The Austine School for the Deaf ("Austine"), is a private, non-profit corporation organized and existing under the laws of the State of Vermont with a principal place of business located at 209 Austine Drive, Brattleboro, Vermont.

4.      Austine receives federal funding pursuant to the Individuals with Educational Disabilities Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"), for each student that enrolls at Austine.

5.      This Court has subject matter jurisdiction over Nicole's claims under Title IX, pursuant to 20 U.S.C. § 1681(a) and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the remainder of Nicole's claims, pursuant to 28 U.S.C. § 1367(a).

6.      This Court has personal jurisdiction over Austine because Austine is physically present in Vermont and because its principal place of business is 209 Austine Drive, Brattleboro, Vermont.

7.      Venue is proper in this Court because both parties reside in Vermont.

## FACTS COMMON TO ALL COUNTS

### The School and its History of Sexual Abuse and Failure to Properly Supervise Staff

8.      Austine was founded in 1904 with a primary purpose of providing educational, consulting and related services to deaf and hard of hearing students.

BOS_BOS_373330_2.DOC/TVANDYCK

9.    Austine provides these services for its students beginning in pre-school and continuing through the twelfth grade.

10.    Austine has had a history of problems associated with (1) staff-on-student sexual molestation and sexual abuse, (2) charging for services that the school does not provide for, and (3) lack of supervision of its students.

11.    According to its own internal documentation, Austine acknowledged in 1996 that staff members were engaging in "on-going unprofessional actions," and that Austine was "charg[ing] for services we do not provide … school districts are paying for services we cannot account for."

12.    A true and accurate copy of a May, 1996 internal Austine document reflecting these concerns is attached hereto as **Exhibit A.**

13.    According to this same Austine internal memo (Exhibit A), there existed a "frequent problem" of "kids not being supervised in the classroom" and that:

> "[t]he school is at risk if we do not resolve this problem …
> We must resolve this problem immediately for the well
> being of Austine school and for liability reasons."

(See Exhibit A).

14.    In addition to the foregoing, there were widespread allegations in 1996 that an Austine staff member had been sexually molesting young boys at the Austine School for several years prior to 1996.

15.    According to a January 6, 1996 Departmental Memorandum by the Vermont Department of Social and Rehabilitation Services, the Vermont SRS concluded the following:

> "Based on information gathered during this investigation, there is
> accurate and reliable information that would lead a reasonable
> person to conclude that Don Powers sexually abused [5 boys]
> when they were students at the Austine School and he was serving



> in a caretaker role …. Due to Mr. Powers' history of abuse, as documented in this report and because he has not received any treatment to address his sexual offending behavior, Mr. Powers, when employed by the Austine School, posed a substantial risk of harm to the students."

16.    A true and accurate copy of this January 6, 1996 Memorandum from the Department of Social and Rehabilitation Services, is attached hereto as **Exhibit B.**

17.    In addition to the foregoing, Austine was also on notice, as of 1996, that there was student-on-student sexual molestation occurring at the school.

18.    In a May 15, 1996 Austine internal memorandum reflecting an Administrative Meeting, the then Principal of the school, Susan Sien, reported that:

> "We had a crisis meeting today concerning [the two students] … There was suspicion that [the two students] were having sexual relations last spring.
>
> Dick asked why [the student perpetrator] was allowed to return to school and how did we try to protect students? … Dick stated it doesn't look good that we allowed him to come back.

19.    A true and accurate copy of this May 15, 1996 internal Austine memorandum is attached hereto as **Exhibit C**.

20.    Because of these and other related issues, Susan Sein, Austine's then-Principal, was forced to resign.

21.    According to Austine's current Superintendent, Mr. Patrick Schrader, the State of Vermont was contemplating closing the school in 1996 because of lack of curriculum and because the school was not abiding by special education requirements.

22.    Also according to Mr. Patrick Schrader, as of May 1996, Austine was supervising its staff poorly and was failing to implement policies appropriately.

BOS_BOS_373330_2.DOC/TVANDYCK

23.    A true and accurate copy of Patrick Schrader's October 28, 2002 deposition testimony reflecting these facts is attached hereto as **Exhibit D**.

24.    Upon information and belief, when Mr. Patrick Schrader became the Superintendent of Austine, he knew the school was being closely monitored by the State of Vermont.

## Nicole

25.    Nicole began attending Austine in 1994 when she was about 5 years old.

26.    Nicole is completely deaf, although she now wears a cochlear implant.

27.    Like most students at Austine, Nicole stayed in the dorm during the week and returned home on weekends.

28.    Nicole attended Austine during 1994 and 1995, and then returned again in the Fall of 1997 where she stayed until June of 2000.

## Rehkop

29.    Austine hired John Rehkop a/k/a Dolph ("Rehkop") in 1996.

30.    Initially, Rehkop was hired as a high school boys student dorm advisor. According to his First Evaluation, he "needed improvement" in almost every category, including the following categories under "Attitude Towards Students":

> - demonstrates appropriate role model,
> - shows tact, patience and consideration in dealing with students,
> - gives praise to students as positive reinforcement,
> - is fair and impartial,
> - develops mutual respect and tolerance.

31.    A true and accurate copy of Rehkop's November 29, 1996 Evaluation is attached hereto as **Exhibit E**.

BOS_BOS_373330_2.DOC/TVANDYCK

32.     Despite Rehkop's poor performance, and specifically his poor attitude towards students, Austine decided to make Rehkop Nicole's one-on-one aide in 1997.

33.     Nicole was 8 years old at the time.

34.     Austine knew or should have known that Rehkop would pose a threat to Nicole based, in part, upon his prior evaluations at Austine.

35.     Given Austine's prior history of abuse, molestation and lack of supervision, as well as Rehkop's poor performance at the school, Austine never should have allowed Rehkop to become Nicole's one-on-one aide.

36.     During the time that Rehkop was Nicole's one-on-one aide, he physically abused her, sexually harassed her and sexually molested her.

37.     The physical abuse included, among other things, hitting her against a door, twisting her wrists and arms, slapping her on the shoulder, pushing her, grabbing her by the shirt, and throwing her against the wall.

38.     On more than one occasion, Nicole required medical attention for her injuries.

39.     Nicole complained to Austine staff about the physical abuse, but nobody at Austine undertook any corrective action.

40.     Nicole's mother was never notified by Austine that her daughter was being injured by Rehkop.

41.     On several occasions, Nicole would go home on weekends with bruises on her body. When Nicole's mother would call Austine about the bruises, she was informed that they were self-inflicted because Nicole was "hyper-active."

42.     Besides the physical abuse, Nicole also was forced to endure sexual abuse and harassment at the hands of Rehkop, when he was her one-on-one aide.

BOS_BOS_373330_2.DOC/TVANDYCK

43.    The sexual abuse and harassment included, but was not limited to, the following: he would frequently grab her breasts; he would kiss her; he would repeatedly ask her to touch his penis; and he would ask her to look at his penis.

44.    Nicole informed school officials of the harassment/abuse, but Austine again ignored her complaints.    Rehkop continued to sexually harass and abuse Nicole after she complained to Austine officials.

### Rehkop Continues This Molestation of Other Students

45.    Rehkop has also repeatedly sexually harassed and molested other female students besides Nicole.

46.    At least one student, other than Nicole, reported Rehkop's conduct to Austine's dormitory staff in May, 1997, who then reported it to administration officials.    Among those alerted about Rehkop's conduct was Rebecca Hilding, Austine's principal at that time.

47.    This student had an eyewitness to her version of events.

48.    This student and her eyewitness wrote statements and provided them to Austine.

49.    Upon further information and belief, not only was Austine's entire "investigation" a sham, but Austine attempted to conceal the "investigation" by destroying its documents concerning the incident.

50.    Upon further information and belief, at least some of the documentation relating to this incident, in fact, has been destroyed by Austine.

51.    A true and accurate copy of a May 7, 1997 internal Austine memo detailing the above allegations, as well as Austine's desire to destroy documents, is attached hereto as **Exhibit F**.



52.    Upon information and belief, Austine engaged in a widespread cover-up concerning these allegations of abuse because of its prior problems and the fact that Austine had almost been shut down by the State of Vermont in 1996.

### More Evidence Of Rehkop's Bad Behavior Toward Females

53.    No later than June 1997, Austine knew, or should have known, that Rehkop could not be trusted with regard to his treatment of females generally.

54.    On June 22, 1997, an employee of the school, complained in writing to police that Rehkop had physically abused her.

55.    In an affidavit, Ms. Larsen stated that Rehkop had punched her in the face and side of the head with a closed fist, given her a swollen lip, crushed her fingers, twisted her wrist, pushed her on to the floor, chased her in his truck and grabbed her.

56.    Ms. Larsen sought and obtained a Relief From Abuse Order against Rehkop.

57.    Rehkop was arrested for domestic assault on the same day that the Relief From Abuse Order was issued.

58.    The next day, June 23, 1997, news of Rehkop's arrest for domestic assault was published in the local newspaper.

59.    At least one Austine official read the newspaper account and reported it to Austine's principal, Rebecca Hilding.

60.    Other Austine officials knew about Rehkop's arrest for domestic assault.

61.    Austine contemplated terminating Rehkop, but chose not to do so.    Instead, Austine required that Rehkop receive counseling for "anger management."

BOS_BOS_373330_2.DOC/TVANDYCK

62.    Upon information and belief, the reason Austine chose not to terminate Rehkop was because Maureen Larson had informed Austine that she would not be returning to Austine in the Fall.

63.    Rehkop returned to Austine for the next academic year, and continued his abuse of other female students, at the school.

## Rehkop Promoted

64.    Despite all of the foregoing, Austine then promoted Rehkop to the position of "behavioral support specialist" beginning in September, 1998.

65.    Because of his new position at Austine, Rehkop was allowed to have unsupervised meetings with other female students besides Nicole as well as unfettered access to school buildings.   In addition, Rehkop sometimes served as an adult supervisor on bus trips. Rehkop also had an office on campus to which students were sent when they misbehaved in class.

## The Abuse Continues With Other Students

66.    Upon information and belief, Rehkop has engaged in similar sexual misconduct with other minor female students attending Austine including, but not limited to, Noella Kolash, Amanda Schauer, Shellene Johnson, and Chrystal Daroczi.  The conduct has included, but is not limited to:

   a.  Forcing one minor female student to have oral sex with him on several separate occasions;

   b.  Pressuring another female minor student on approximately five or six occasions to show him her breasts;

   c.  Forcing a female minor student to perform oral sex on him on multiple occasions;

BOS_BOS_373330_2.DOC/TVANDYCK

    d.   Repeatedly propositioning at least one other female student to engage in sex for money; and

    e.   Telling at least one of the girls that having sex would be good for her future.

67.    All of the foregoing activity took place on Austine grounds and while Rehkop was employed as the "behavioral support specialist" for Austine.

68.    At least some of the foregoing activity was reported by the female minor students to Austine officials.

69.    Despite knowledge of Rehkop's actions as early as 1997, Austine failed to take appropriate action until the fall of 1999.  At that time, two female students reported another incident of sexual molestation involving Rehkop and a minor female student.  Austine first placed Rehkop on probation.

70.    After only two days on this probation, Austine fired Rehkop.

71.    Despite all of the foregoing, the reason Austine gave for Rehkop's termination was the fact that he was viewing pornography on his school computer.

72.    In August of 2001, Rehkop was arrested on four counts of sexual assault of a minor and is currently awaiting trial on those charges.

## COUNT I
## (Title IX)

73.    Plaintiff restates and incorporates herein by reference the statements made in paragraphs 1 through 72 above.

74.    At all times relevant to this Complaint, Nicole was a student at Austine.

75.    At all times relevant to this Complaint, Nicole was subjected to sexual harassment, molestation, and physical abuse at the hands of Rehkop, her one-on-one aide.

BOS_BOS_373330_2.DOC/TVANDYCK

76.    At all times relevant to this Complaint, the harassment, molestation and abuse was so severe and pervasive as to create an abusive educational environment.

77.    At all times relevant to this Complaint, at least one Austine official authorized to take corrective action had actual knowledge about the harassment, molestation and physical abuse of Nicole, yet exhibited deliberate indifference to it.  As a result, Rehkop continued to subject Nicole to gender-based harassment, molestation and physical abuse.

78.    At all times relevant to this Complaint, Austine received federal funding.

79.    As a direct result of Austine's deliberate indifference to Rehkop's harassment, molestation, and physical abuse of Nicole, Nicole has suffered, and will continue to suffer, physical, emotional and financial damages.

80.    Austine is liable to Nicole in an amount to be determined at trial for the damages she has suffered.

81.    Pursuant to Title IX, Austine is also liable for the reasonable attorneys' fees Nicole has incurred in having to prosecute this action.

## COUNT II
## (Negligent Hiring)

82.    Plaintiff restates and incorporates herein by reference the statements made in paragraphs 1 through 81 above.

83.    Austine knew, or should have known, that Rehkop had a proclivity for sexual molestation when it hired him in 1996.

84.    Shortly after Austine's hiring of Rehkop, he began to engage in illegal sexual contact with minor students and directed sexually offensive comments at minor children, including Nicole.

BOS_BOS_373330_2.DOC/TVANDYCK

85.    Because of Austine's negligence in hiring Rehkop, Nicole has suffered, and will continue to suffer, physical, emotional and financial damages.

86.    Austine is liable to Nicole in an amount to be determined at trial for the damages she has suffered.

## COUNT III
### (Negligent Retention)

87.    Plaintiff restates and incorporates herein by reference the statements made in paragraphs 1 through 86 above.

88.    Despite receiving complaints as early as 1997 that Rehkop had sexually harassed and molested minor female students, including Nicole, and had violently assaulted another female employee of the school, Austine continued to retain Rehkop as an employee of the school until the fall of 1999.

89.    Austine negligently retained Rehkop with knowledge of his inappropriate and illegal actions.

90.    Austine's negligent retention of Rehkop after it became aware of his improper and illegal conduct toward females permitted Rehkop to continue harassing, molesting and physical abuse of Nicole, thereby causing Nicole to suffer damages.

91.    Austine is liable to Nicole in an amount to be determined at trial for the damages she has suffered.

## COUNT IV
### (Negligent Supervision)

92.    Plaintiff restates and incorporates herein by reference the statements made in paragraphs 1 through 91 above.

BOS_BOS_373330_2.DOC/TVANDYCK

93.    Despite complaints about his inappropriate and illegal sexual contact with minors, and his violent tendencies toward women generally, Austine permitted Rehkop to have unsupervised visits with Nicole.

94.    During these unsupervised visits, Rehkop sexually harassed, molested, and physically abused Nicole.

95.    Each incident of Rehkop's sexual harassment and molestation of Nicole occurred on Austine grounds.

96.    During each incident of Rehkop's sexual harassment and molestation of Nicole, an employee or administrator of Austine was in a position to prevent the sexual harassment and/or molestation.

97.    Despite its knowledge of Rehkop's behavior with other minor female students and his domestic assault of a female employee of the school, Austine did nothing to prevent Rehkop's sexual harassment, molestation, and physical abuse of Nicole.

98.    Because of Austine's negligent supervision of Rehkop, Nicole has suffered, and will continue to suffer, physical, emotional and financial damages.

99.    Austine is liable to Nicole in an amount to be determined at trial for the damages she has suffered.

<u>**COUNT V**</u>
<u>**(Assault And Battery)**</u>

100.    Plaintiff restates and incorporates herein by reference the statements made in paragraphs 1 through 99 above.

101.    While acting within his scope of employment as one-on-one aide at Austine, Rehkop assaulted and battered Nicole via the intentional and malicious act of sexual molestation and physical abuse.

BOS_BOS_373330_2.DOC/TVANDYCK

102.    The assault on Nicole has caused her damage.

103.    Austine is obligated to Nicole for damage inflicted upon Nicole by Rehkop while Rehkop was employed as her one-on-one aide.

### COUNT VI
### (Intentional Infliction Of Emotional Distress)

104.    Plaintiff restates and incorporates herein by reference the statements made in paragraphs 1 through 103 above.

105.    While acting in his capacity as a one-on-one aide for Austine, Rehkop intentionally engaged in conduct against Nicole that was extreme, outrageous and beyond all possible bounds of decency.

106.    Rehkop knew, or had reason to know, that sexually harassing and molesting a deaf child would cause her severe emotional distress.

107.    Because of Rehkop's actions, Nicole has suffered and will continue to suffer, emotional distress and other damage.

108.    Austine is therefore liable to Nicole for damages in an amount to be determined at trial.

### COUNT VII
### (Negligent Infliction Of Emotional Distress)

109.    Plaintiff restates and incorporates here and by reference the statements made in paragraphs 1 through 108 above.

110.    While acting as a one-on-one aide for Austine, Rehkop negligently engaged in conduct against Nicole that was extreme, outrageous and beyond all possible bounds of decency.

111.    Rehkop knew, or had reason to know that physically abusing, sexually harassing and molesting a deaf child would cause for severe emotional distress.

112.    Because of Rehkop's actions, Nicole has suffered and will continue to suffer, emotional distress and other damages.

## PRAYERS FOR RELIEF

**WHEREFORE**, the Plaintiff, Nicole Woods prays that this Court enter the following relief:

1.      Judgment in favor of the Plaintiff and against the Defendant, The Vermont Center for the Deaf and Hard of Hearing Inc. d/b/a Austine for the Deaf pursuant to Counts I through VI above in an amount to be determined at trial but estimated to be not less than Five Million Dollars ($5,000,000);

2.      Punitive damages in an amount to be assessed by the jury.

3.      Attorneys' Fees, pursuant to Title IX and 42 U.S.C. § 1988; and

4.      For such other and further relief as this Court deems just and proper.

## PLAINTIFF DEMANDS A JURY TRIAL ON ISSUES SO TRIABLE

NICOLE WOODS BY AND THROUGH
HER MOTHER AND NEXT FRIEND,
TRISHA PIDGEON,

By her attorneys,

Samuel H. Angell
Fitts, Olson & Giddings, P.L.C.
16 High Street
Brattleboro, VT 05301-3001
802-254-2345

# EXHIBIT A



Plaintiff's Exhibit IS
58
Schaeffer-Dfd
12-10-02   T. Violette

## Administration Meeting

Present: Don Powers, Will Verbits, Dick Virkstis, Kathy Gent, and Susan Sien
Interpreter: Virginia Husted

Agenda:

- Staff-hiring
- Budget
- Re-organization

Minutes:

**I. Staff**
Judy Kinoy-there are problems regarding on-going unprofessional actions. Judy was inappropriate yesterday in Vanessa's IEP suggesting Vanessa live with Judy as a foster parent in front of Vanessa's mother with out prior discussion. Also, her behavior regarding handing in her time card late and then expecting to get paid. When her request was denied she refused to come to work today. Decision was made to give her a written warning.

High school girls dorm staffing problems-Amy B. will be added to help out.

**II. Staff-Hiring**
Bob was replaced with Kathy Vandal and a new person was hired in the kitchen.

**III. Budget**
The challenge program tuition has been incorporated into the regular tuition in the current proposed budget. The goal is to establish a base tuition rate and then charge for additional services ie. counseling, one-to-one aides, ect. Currently regular tuition is $43,000 and Challenge (residential) tuition is $50,000. Kathy's proposal is to charge regular tuition for all students and then add on additional charges for Challenge services. The concern is that currently we charge for services we do not provide. School districts are paying for services we can not account for. Specifically in Mindy Tyler's case we are not meeting the IEP objectives but still charging for Challenge tuition. These problem arouse due to Joyce's lack of follow through and lack of accountability as far as the budget is concerned.

What is required to serve a Challenge Student beyond what we normally provide? The kids in the Challenge program have more serious mental health issues. The level of therapy is beyond Ina Schaeffer's ability, behavioral specialists would be

A 2823

^00378

DKM 000101





Page 2

required as well. One-to-one aides are necessary in the classroom and in the dorm. Decision was made to establish a base for the regular tuition and establish a base for the Challenge tuition and then add on additional services.

### IV. Current Budget
Kathy will hand out a copy to everyone tomorrow. Concerns were brought up relating to the waste in the kitchen and tremendous cost of ordering. Peter Skib will come back to Austine in the fall depending on his doctors report.

### V. RA Schedule Change
The RA's do have a difficult schedule, working in the mornings and in the afternoons. They are currently salaried employees. Their ideas concept is good but difficult. Kathy suggested that RA's should not be salaried employees according to Labor Laws. They should be hourly employees. Concerns were suggested regarding coverage. It was agreed that a couple RA representatives should come to the administration meeting to share their concerns and ideas.

### VI. Allegations made against Don Powers
The serious issues relating to Don Powers are common knowledge around campus. We need to resolve these issues so we are not in the eyes of the students, parents and staff, doing nothing. In the best interest of the school it would be advisable if Don were to take an administrative leave. A memo will be sent out to staff that Don is on temporary leave. If the accusations are found to be false we would expect Don to come back and there are many people who look up to him. Susan made the recomendation that Don take administrative leave. In terms of coverage Alana can take over and additional help will come from Susan.

### VII. Lack of Supervision in Classrooms
We need to make sure we do not have classes where kids are not being supervised. The school is at risk if we do not resolve this problem. It is a frequent problem. We must resolve this problem immediately for the well being of Austine school and for liability reasons. Who is there to make sure coverage happens with subs and with lesson plans? There were many teachers on personal leave on the same day which made it difficult to find coverage. Also, we do not have reliable coverage as substitutes. We must set up a safety net to make sure this never happens again ie. no more than 3 people of personal leave at a time, and if subs don't show up for there responsibilities then we don't ask him/her to sub again, and set up a resource room for tutoring or study hall with a teacher there all the time.

### VIII. Administrative Team
The team is supposed to make decisions as a collective but it seems that Susan made the decision to have Steve Casella come back without the team. He is supposed to stay away from Vanessa, but how will we do this? Don is supposed to provide a one-to-one for him at night. The investigation has not been completed by SRS which

A 2824

~ 00379

DKM 000102

Page 3

puts our other students and school at risk. There have been allegations made that he raped a girl off campus and on campus. He has come back to school because he is getting behind on his work, his parents are angry, and he is sitting at home getting fat.

### IX. Break-In

Holton Hall was broken into as well as, the snack bar. It is assumed that the Karate students were involved because Lori Collette saw them in the library. Nails, thumb tacks and screws were poured on the floor in the library and the glass was broken on the candy display in the snack bar. A letter will be sent to the karate instructor asking him to make sure his students are supervised.

### X. Project Adventure

Wants to set up a structure. Wooden with out electricity and plumbing. It has been approved to be set up in the woods.

Meeting Adjourned 5:30pm.

Respectfully Submitted,
Tami Mahurin

A 2825

000380

DKM 000103

# EXHIBIT B



**DEPARTMENTAL MEMORANDUM**

**Agency of Human Services**
**Department of Social and Rehabilitation Services**

**TO:**     Leane Page, Operations Manager

**FROM:**   Martha Johnson, Investigative Social Worker

**DATE:**   January 6, 1996

**SUBJECT:** Investigative Report regarding the allegation that Don
Powers, Residential Director at the Austine School,
sexually abused students at the school 10-15 years ago.

---

**ALLEGATION:**

On 4/12//96, a report was received by SIU ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
reported that a current staff person, who is also a former student,
had recently told her that Don Powers had molested a number of
students ten to fifteen years ago.  At the time of the report, it
was not known by SIU if this staff person was a victim or only had
knowledge of the alleged behavior.

**ASSIGNMENT:**

On 4/12/96, this report was assigned to Martha Johnson,
Special Investigations Unit, for evaluation of substantial risk of
harm to current students at the Austine School.

**LIST OF PERSON CONTACTED:**

1.  Brenda Fraenkel, Principal at Austine School, 4/15/96
    (telephone); 4/16/96 (attempted telephone); 4/17/96
    (attempted telephone); 4/18/96 (meeting).

2.  Laurie Meyer, Interpreter, 4/15/96 (attempted telephone);
    4/16/96 (telephone); 4/17/96 (meeting); 5/21/96
    (meeting).

3.  Jimmy Challis, witness/former student at Austine School,
    4/17/96 (interview); 4/18/96 (meeting); 4/23/96
    (attempted telephone); 4/26/96 (interview).

4.  Tammy Mahurin, secretary/interpreter, 4/18/96.          A 2447

1

000002

5.   Mary Rodreguez, Referral Service, 4/19/96 (telephone); 4/22/96 (telephone); 6/27/96 (telephone); 11/19/96 (telephone).

6.   Kathy "Strzempko" Gent, Personnel Director at Austine School, 4/23/96 (telephone); 4/24/96 (meeting); 4/25/96 (telephone); 5/7/96 telephone); 5/20/96 (telephone).

7.   Susan Sien, Executive Director, 4/15/96 (fax received); 4/26/96 (telephone); 4/26/96 (meeting); 4/29/96 (telephone); 4/30/96 (telephone); 5/8/96 (letter); 5/8/96 (telephone).

8.   Laurie Benjamin, Interpreter, 4/26/96 (meeting).

9.   Mark Dore, staff person at Wheeler House (affiliated with Austine School), 4/26/96 (meeting); 4/29/96 (telephone); 5/2/96 (telephone).

10.   Ronald Marsh, former student/alleged victim, 5/3/96 (letter); 5/31/96 (letter).

11.   Steve Mosher (dob 8/28/63, class of 1982), alleged victim, 5/7/96 (attempted telephone); 5/8/96 (telephone); 5/21/96 (interview, pg. 13).

12.   James Gadrault, former student/alleged victim, 5/8/96 (letter); 6/24/96 (letter).

13.   Annette Martello, Administrative Assistant at North Central Correctional Institute, Gardner, MA, 5/14/96 (telephone); 5/24/96, (telephone).

14.   Judy Kinoy, Resident Assistant at Austine School, 5/14/96 (telephone); 5/16/96 (telephone).

15.   John Marshall, Superintendent at North Central Correctional Institute, Gardner, MA, 5/16/96 (letter).

16.   Detective Steve Rowell, Brattleboro Police Department, 5/17/96 (telephone).

17.   Karen Richards, attorney for Department of Education, 5/21/96 (telephone); 5/22/96 (telephone).

18.   Anonymous caller, former staff person, 5/22/96 (telephone).

19.   Richard Virkstis, Director of Development at Austine School, 5/21/96 (meeting); 5/22/96 (telephone); 5/24/96 (telephone); 6/20/96 (telephone); 6/25/96 (telephone);

2

000003

A 2448

6/26/96 (telephone); 7/3/96 (telephone); 7/11/96 (attempted telephone); 7/24/96 (telephone); 7/24/96 (meeting); 11/8/96 (telephone); 12/19/96 (telephone); 12/23/96 (telephone).

20. Dominick Bonura, acting Executive Director at Austine School, 6/7/96 (telephone); 7/24/96 (meeting).

21. Don Powers, accused, 6/7/96 (letter); 6/17/96 (attempted telephone); 6/18/96 (telephone); 6/20/96 (interview); 12/5/96 (interview); 12/19/96 (attempted telephone); 12/20/96 (attempted telephone); 12/21/96 (attempted telephone); 12/24/96 (telephone).

22. Richard Carroll, attorney for Don Powers, 6/19/96 (telephone); 6/20/96 (meeting); 11/19/96 (attempted telephone); 11/19/96 (attempted telephone); 12/5/96 (meeting); 12/30/96 (telephone).

23. Judy Powers, wife of Don Powers, 6/20/96 (meeting); 12/5/96 (meeting); 12/19/96 (telephone); 12/20/96 (telephone); 12/24/96 (telephone).

24. Tupper Dunbar, Interpreter, 6/20/96 (meeting).

25. John Fish, Administrator at Austine School, 6/21/96 (telephone).

26. Richard Lane, former Headmaster of Austine School, 6/21/96 (telephone).

27. Christopher Perreault(dob 10/14/61, class of 1980), alleged victim, 6/24/96 (letter); 9/17/96 (letter); 11/6/96 (interview, pg. 29).

28. Mitchell Trombley, parent of possible witness, 6/24/96 (attempted telephone); 6/25/96 (attempted telephone); 6/26/96 (attempted telephone); 7/24/96 (attempted telephone); 7/25/96 (letter).

29. Detective Rick Andrews, Brattleboro Police Department, 7/2/96 (meeting); undocumented date (telephone).

30. William Werden (dob 2/7/72, class of 1992), alleged victim, 6/26/96 (telephone); 6/26/96 (letter); 7/2/96 (interview, pg. 26).

31. Patricia Werden, mother of William Werden, 7/1/96 (telephone).

32. Virginia Nolan, Interpreter, 7/24/96 (meeting).

A 2449

3

000004

33. Diane Perreault, mother of Christopher Perreault, 9/25/96 (telephone); 10/25/96 (telephone).

34. Allie, staff person at Vermont Referral Service for the Deaf, 10/21/96 (telephone).

35. Joan Pellerin, Interpreter, 11/6/96 (meeting).

36. Rene Pellerin, Vocational Rehabilitation Counselor for Ronald Chaffee, 11/11/96 (TTY); 11/14/96 (TTY).

37. Ronald Chaffee (dob 10/1/71, class of 1990), alleged victim, 11/14/96 (TTY interview, pg. 31).

38. Janice, staff person at Vermont Referral Service for the Deaf, 11/19/96 (telephone).

39. Janice Cagan-Teuber, Interpreter, 12/5/96 (meeting).

39. Arthur Challis (dob 7/14/61, class of 1980), alleged victim, 12/6/96 (letter).

40. Raymond Stevens, former administrator at Austine School, 12/19/96 (telephone).

41. Sergeant John Dudek, Hinsdale, New Hampshire Police Department, 12/27/96 (telephone).

## DECISION:

On 12/5/96, this investigation was discussed with supervisor George Karson. The information gathered during this investigation would lead a reasonable person to believe that Don Powers sexually abused Steve Mosher, Arthur Challis, William Werden, Ron Chaffee and Chris Perreault when they were students (children) at the Austine School. Furthermore, based on Mr. Powers' history of abuse and because he has not received sex offender treatment, Mr. Powers posed a substantial risk of harm - sexual, to current students at the Austine School.

## JUSTIFICATION:

Due to the unavailability of Susan Sien, this investigator contacted Brenda Fraenkel, the principal at Austine School. She identified the original source of the report as Jimmy Challis, who is currently a teacher on staff and formerly a student at Austine School. Ms. Fraenkel understood that as a former student, Mr. Challis witnessed sexual abuse of other students by Don Powers while at Austine School. Ms. Fraenkel indicated that Jimmy Challis had a list of names of victims with whom he has been in contact.

4

000005

A 2450

According to Jimmy Challis, these former students were troubled by what happened. Ms. Fraenkel said she did not question Mr. Challis about what happened, but understood that he had not come forward sooner due to his fear of retaliation. Ms. Fraenkel further commented that Mr. Challis had not had the courage to come forward until now and that he is still fearful. Ms. Fraenkel said that Mr. Challis has given no indication that he was victimized. Ms. Fraenkel said that Mr. Challis has been told that SRS was contacted and would need to meet with him.

On 4/17/96, this investigator interviewed Jimmy Challis at the Austine School. Laurie Meyer interpreted this meeting. Mr. Challis provided the following information: He had been a student at Austine School from the Fall of 1971 to 1973. Don Powers, the Dean of Students, had been a dorm supervisor during the aforementioned time period. He described that Don Powers would fool around and wrestle with boys in the dorm and that the wrestling always led to touching or grabbing of the genitals. He said Don always initiated the grabbing and sometimes the boys responded by grabbing Don. Don and the boys were always clothed when Mr. Challis witnessed this behavior. Mr. Challis denied that this behavior occurred with him. Mr. Challis indicated that he used to call Don a "fag" and that Don knew not to try that behavior with him. Mr. Challis named five former students whom he said he witnessed being grabbed in the genitals by Don: James Gadrault, Billy Hudson, Gary Palmer, David Lunderville, Lloyd Downing. Mr. Challis indicated that if these people were questioned, they might say the activity was just "playing."

Mr. Challis indicated that at the time of his observations, he had not brought up the subject with the other students nor with Don. However, he said he had recently talked with some of these former peers, as well as with former students from the 1985 to 1986 time period. Note: Mr. Challis was hesitant to provide names during our meeting. Mr. Challis referred this investigator to Kathy Gent, the Director of Personnel, who Mr. Challis understood had received reports from people over the years complaining about Don. When asked how he knew this information, Mr. Challis said that as a member of the alumni organization, he has heard people talk.

Mr. Challis indicated that he has other "hearsay" information and that there is a lot of talk about other types of abuse by Don. He expressed that he did not feel free to repeat this information because it was "hearsay". He added that people knew an investigation was happening, that people were talking and people would come forward once information started to come out. Mr. Challis said he was not aware of any current victims, but suggested that Clint Casella and other students who have been expelled be interviewed. Mr. Challis said a couple of weeks ago he had talked with Clint Casella and Clint had told him about separate incidents

5

of Don rubbing him on the back and watching him in the shower. Mr.
Challis said Clint was angry when he talked with him.

Mr. Challis indicated that he was coming forward now because
he had taken a workshop on child abuse prevention and this training
made him think about his own experiences and about what happened
in the dorm. Note: It was not clear to this investigator when Mr.
Challis took this workshop. Mr. Challis acknowledged that he could
have made a report long ago, but he was fearful of being fired from
his job at Austine School. He indicated that he now needed to be
free of this burden.

On 4/18/96, this investigator met briefly with Jimmy Challis.
Brenda Fraenkel and her secretary, Tammy Mahurin, were present.
Ms. Mahurin interpreted.     The purpose of this meeting was to
clarify information previously provided by Mr. Challis, as well as
to gather additional information he might have. Mr. Challis was
given the choice of communicating via a computer screen or through
the services of a certified interpreter, with the latter needing
to be arranged for a future date. Note: Ms. Mahurin is not a
certified interpreter. Mr. Challis preferred the use of an
interpreter rather than communicating via a computer screen. I
agreed to contact Mary Rodreguez from the Referral Service to
arrange for an interpreter for our next meeting.

On 4/26/96, this investigator interviewed Jimmy Challis at the
Austine School. Our meeting was interpreted by Laurie Benjamin.
Mr. Challis again discussed his past observations of Don Powers
wrestling with boys in the dorm. He again named students that Don
either tried to grab or did grab in the genitals. In addition, Mr.
Challis named other sources whom he said had information.

Mr. Challis first identified Steve Mosher, who is a former
student. Mr. Challis said one month ago, Steve Mosher stopped at
his house. Steve was not very clear, but Mr. Challis understood
he was complaining about an incident that happened when he had been
a student at Austine School. Steve complained that he had been
blamed for sexually touching another student and had been suspended
for two weeks for this behavior. Steve then complained to Mr.
Challis that he wanted Don Powers removed from the school, saying
that it was not appropriate for Don to be at the school. Steve
told Mr. Challis that he saw Don "touch" other students and that
he had seen Don naked in the shower with other students or saw Don
and students leaving the shower together. Mr. Challis said he last
talked with Steve on the weekend that followed our first meeting.
At that time, Steve indicated to him that he was trying to contact
other people who had information.

Mr. Challis then named Mark Dore, who is a staff person at
Wheeler House. Mr. Challis indicated that a lot of people have
told things to Mr. Dore and that he has information.

6

000007

A 2452

Mr. Challis then named Debbie Hammond and Mary Gorman; both are staff persons at the Austine School. Mr. Challis said two to three months ago, Debbie told him she had heard about "anal sex and blow jobs" happening with Don Powers. Mr. Challis indicated that he did not know if Debbie had heard rumors or had been told by victims about this behavior. Mr. Challis said Mary Gorman had also "heard stuff" and had indicated to him that she had funny feelings and that something was bothering her.

Mr. Challis then mentioned James Gadrault again. He described an incident that occurred in October, 1995, in which James had been drunk and told him about Don Powers "groping him sexually." James also signed "blow job" when he talked about Don, but he did not give other specifics to Mr. Challis.

Mr. Challis further stated that he is a friend of the Casella family. Mr. Challis said he had spent time with Clint Casella and that he noticed a change in Clint's behavior starting at the age of 12 years old. Mr. Challis indicated that Clint is angry with Don Powers and has been angry with him since the age of 12. Mr. Challis said Clint talked about Don watching him in the shower a long time ago, when Clint was younger. Clint also indicated to Mr. Challis that there had been an incident of Don rubbing his back. Clint did not give other details to Mr. Challis. Mr. Challis described Clint as "closed, but angry" and thought this investigator should talk with Clint.

On 4/23/96, this investigator spoke with Kathy Gent. Ms. Gent said that after Susan Sien made a report to SRS, she called an emergency administrative team meeting. Ms. Gent said she is a member of that team. The team decided they needed to do their own investigation. They had spoken with the school attorney who advised that it would not be proper to suspend Don Powers due to the time frame involved and because they were unable to prove the abuse. Ms. Gent then started Austine's investigation by interviewing Jimmy Challis. This interview took place on 4/15/96. Mr. Challis gave her a list of names, some who were current employees. The people Ms. Gent talked with had been identified as either witnessing past abuse or having hearsay information about past abuse by Don Powers. Ms. Gent said no details were given to her and that everyone was afraid to talk. The people she talked with then directed her to others; however, no one made disclosures of their own victimization. Ms. Gent identified some of the people with whom she talked. She added that she had also been approached by people who wanted to talk with her about Don Powers. Ms. Gent said there has been supposition that deals were made by Don Powers to keep people silent or that he used threats. Note: According to written documentation later provided to this investigator by Richard Virkstis, the aforementioned emergency administrative team meeting was held on 4/12/96. See SIU case file for copy of a memorandum from Mr. Virkstis to Dominick Bonura, dated 5/25/96.

7

On 4/24/96, this investigator met with Kathy Gent at the Austine School. Ms. Gent provided names of people she had obtained. Debbie Hammond, who is a teacher and former student, was told about things that happened in the 1980's when she was a student. She did not give details to Ms. Gent but gave her five names of former students that she identified as victims: John Russell, Kevin Hopkins, Arthur Challis, Ron Richard and Steve Mosher. Ms. Gent said that Kevin Hopkins was in a Massachusetts jail for attempted murder and that Arthur Challis was in jail for sexual abuse of students while at the Learning Center in Framingham, MA. Ms. Gent added that Arthur Challis is the younger brother of Jimmy Challis.

When Ms. Gent met with Jimmy Challis on 4/15/96, he did not give her details about what he witnessed or was told. However, he gave Ms. Gent an idea of what he thought happened, which included incidents of fondling and oral sex between Don Powers and former students. Mr. Challis also told Ms. Gent that Don Powers used to grab boys' buttocks to determine if they were receptive to his advances. Mr. Challis gave her the following names: Mary Gorman, identified as a witness; Yolanda Henry, identified as a witness; Bill Hudson, identified as a victim; Gary Palmer, identified as a victim; James Gadrault, identified as a victim; David Lunderville, identified as a victim; Steve Mosher, identified as a victim; Mark Dore, unclear if identified as a witness or as victim; Alex Bonura, identified as a victim; Patrick Burns, identified as a victim; John Kennedy, identified as a victim. Note: Ms. Gent said she spoke with Yolanda Henry, who said she did not know anything and was shocked and surprised. Ms. Gent had also communicated with Bill Hudson, who is a board member, and he denied that he had been a victim of sexual abuse by Don Powers. (Note: See copy of TTY printout of Ms. Gent's conversation with Bill Hudson.)

Ms. Gent said she met again with Jimmy Challis on 4/23/96 and he asked her if she had talked with Mark Dore yet. Mr. Challis encouraged her to talk with Mr. Dore, saying he had information.

Ms. Gent said she was not aware of personal or work related problems between Jimmy Challis and Don Powers. However, she thought when Jimmy Challis was a student, Don Powers was involved with having him expelled for branding another student. She further stated that Arthur Challis was also expelled and she believes Don Powers was responsible for that, too. She said she is not aware of others who may have grudges against Don Powers.

Ms. Gent said she talked with Ina Schaeffer, the school counselor, and she named students that she suspected were involved with Don Powers. Ms. Schaeffer named Luke Poquette, who she described as a troubled child who Don Powers befriended. Apparently, Luke used to go home with Don Powers. Ms. Schaeffer named Lyman Lawyer as being pinched on the butt by Don Powers. Ms. Gent did not know how Ms. Schaeffer knew this. Ms. Schaeffer also

8

named Stan Sanders, who is Don Powers' stepson. Ms. Schaeffer indicated to Ms. Gent that she had reason to believe that Stan was abused while growing up in Don Powers' home.

Ms. Gent said she was approached by another staff person, Laurie Collette, who confirmed that Luke Poquette had been victimized by Don Powers. Ms. Collette told her that she and Luke had been students together and that Luke had told her about his victimization by Don Powers. However, Ms. Collette did not want to give details to Ms. Gent and said she was afraid of repercussions because Don Powers was her boss. Ms. Collette also said she had other names but wanted to talk with these people before releasing their names.

Ms. Gent was also approached by Jennifer Lanpher, who is a current staff person and former student. Ms. Lanpher said when she had Don Powers for shop class, she defied him on one occasion. Ms. Lanpher said Don became angry, grabbed and shook her and pushed her into a closet and dragged her across the floor. Ms. Lanpher said she had been injured and went to the nurse's office and was bandaged. Ms. Lanpher also gave 3 names to Ms. Gent: Luke Poquette, John Russell, and Wayne Betts, Sr. Ms. Lanpher said she had a conversation with these 3 men about oral sex and masturbation and believes this is what they experienced with Don Powers. Ms. Gent said Wayne Betts is married to Kathy Betts, who is an aide at Austine School. There has been a lot of hostility between Kathy Betts and Don Powers and he has come close to disciplining her but had not done this.

During a telephone conversation with Ms. Gent on 4/25/96, she said she had spoken with Mark Dore. Mr. Dore used to be a vocational rehabilitation counselor for a person named Ronald Miller who is also a former student at Austine School. Mr. Dore told Ms. Gent that when he worked with Ronald, Ronald told him that Don Powers had sexually molested him. No details had been given about what the molestation involved. Ms. Gent said Ronald now has problems with women and has been in trouble with the local police in the past. Ms. Gent said Ronald currently lives in Greenfield, MA.

Prior to meeting with Jimmy Challis on 4/26/96, this investigator met with ███████████. Laurie Benjamin interpreted. ████████ said she did not have a current address for Ron Miller and directed this investigator to Mark Dore who might have this information. She indicated that Ronald Miller was a 1981 graduate.

██████ said Jimmy Challis had approached two other people, Brenda Fraenkel and Ina Schaeffer, before bringing his concerns to her. When ████████ met with Jimmy Challis, he had made a general statement about witnessing Don Powers having sex with someone. ████ then met with Ms. Schaeffer and Ms. Fraenkel and it was decided that SRS should be contacted.

9

000010

A 2455

███████ said ██ spoke with Bill Hudson after ███ had spoken
with Jimmy Challis.    ████████ said that Mr. Hudson indicated to ██
that he had no idea of past problems with Don Powers and that he
had never witnessed anything.  Mr. Hudson told ████████ that Jimmy
Challis had called Alex Bonura and had tried to ask him questions
about what happened in the past.    ████████ said Mr. Hudson wondered
if Jimmy Challis was "trying to stir up the pot."  ███████████
indicated that the name of Wayne Betts, Sr. had also been mentioned
to her.  ███ said ███ had planned on speaking with Mr. Betts and
his wife, Kathy, but actually only spoke with Kathy.  Apparently,
Mrs. Betts told ████████ that her husband was never involved with
anything to do with Don Powers, although Don had been described as
being "rough" in the dorm.

████████ initially said that Jimmy Challis graduated in 1973
and then commented that he had been kicked out of school.
Apparently, Don Powers had reported that Jimmy Challis had been
involved with some kind of hazing incident.  ████████ said ███ was
not aware of current problems between Don Powers and Jimmy Challis;
however, ███ questioned the credibility of Jimmy Challis and
suspected that he might be looking for revenge.  ████████ also made
reference to Arthur Challis and rumors about his victimization by
Don Powers.  ███ did not have specifics.  Apparently, Jimmy Challis
said Arthur had a sexual identity problem and blamed this on Don
Powers, who had labeled Arthur "gay" when Arthur had been a
student.

After interviewing Jimmy Challis on 4/26/96, this investigator
interviewed Mark Dore, who is a staff person at Wheeler House.
Laurie Benjamin interpreted.  Mr. Dore said when he was a
vocational rehabilitation counselor, he worked with a young man
named Ronald Miller.  Mr. Miller graduated from Austine School in
1990 or 1991.  Mr. Dore recalled that Mr. Miller had been charged
with sexually assaulting a woman in the community and sought out
the advocacy of Mr. Dore.  Mr. Miller told Mr. Dore that when he
was younger, possibly 12 years old, Don Powers had sexually abused
him.  Mr. Miller expressed that he was angry about this and felt
it had implications on his own sexual behavior.  Mr. Dore said that
Mr. Miller could not talk about the abuse due to being scared and
embarrassed.

Note:  During a follow up contact with Susan Sien, she stated
that the school had no file listing for a former student named
Ronald Miller.  This investigator later learned from Mark Dore that
he had mistakenly given the name of Ronald Miller and that the
person he had actually worked with was Ronald Marsh.  On 5/3/96,
this investigator sent a letter to Ronald Marsh using the address
provided by Mark Dore.  This letter was later returned by the
postal service marked "addressee unknown."

10

During a contact with Susan Sien on 4/29/96, she recalled that
two years ago, she had received an anonymous letter that advised
her not to trust Don Powers.  The letter also contained concerns
about Don taking boys in his truck or to his house.  Ms. Sien said
she confronted Don after receiving the letter and he responded with
disappointment and he was upset.  He expressed to her that he had
heard rumors before, that he was tired of the rumors and that it
was "nothing new."  He indicated that he did spend time with
children after school.  Ms. Sien said she felt comfortable with
Don's response because she knew him.

On 5/15/96, this investigator sent a letter to James Gadrault,
using an address provided by Susan Sien.  This letter was later
returned by the postal service with the explanation "authorized
forwarding has expired."

During a telephone conversation with Kathy Gent on 5/7/96, she
stated that she had spoken again with Jimmy Challis.  He told her
that during a conversation with Steve Mosher, Steve said when he
was a student, he was given an F in Don Powers' class.  Reportedly,
Don offered to give Steve a better grade if he gave Don a "blow
job."  Ms. Gent believed this did occur because Steve told Mr.
Challis that he felt dirty and embarrassed about the whole thing.
This investigator does not know the date on which this conversation
occurred between Ms. Gent and Jimmy Challis.  However, this
investigator understood from Ms. Gent that Mr. Challis had gotten
this information from Steve Mosher on the Saturday before 5/7/96.

During a telephone conversation with Susan Sien on 5/7/96, she
stated that Don Powers had been asked to take an administrative
leave due to all the talking that was occurring.  She said Don was
made aware of the allegations, but was not given details.  She said
that Don denied the allegations and thought people were out to get
him since he had become Dean of Students.  He mentioned the name
of Jimmy Challis and told Ms. Sien that he had heard from a
colleague of his that Jimmy Challis was calling everyone.

After numerous attempts to contact Steve Mosher, this
investigator talked with him via the Relay Service on 5/8/96.
Although Mr. Mosher's comments and replies were sometimes
disjointed and confusing, he indicated that he had been a victim
of Don Powers.  Mr. Mosher expressed willingness to talk further
and this investigator agreed to have an interpreter available for
anticipated meeting.

On 5/14/96, this investigator learned that Arthur Challis had
recently told Jimmy Challis that when he was a child, he had sexual
contact with Don Powers.  This investigator then contacted Annette
Martello from the North Central Correctional Institute in Gardner,
MA, for the purpose of obtaining permission to visit the facility
to interview Arthur Challis.  Ms. Martello instructed this
investigator to write a request to John Marshall, Superintendent.

11

000012

A 2457

See letter to John Marshall dated 5/16/96.  Note:  During a
subsequent contact with Ms. Martello, she said Arthur Challis was
not willing to talk with SRS.  Apparently, he gave no explanation
for his refusal to meet.

On 5/14/96, this investigator contacted Judy Kinoy, a staff
person at the Austine School.  During this contact, Ms. Kinoy
provided the following information:  In 1991 or 1992, a former
student and former resident assistant, Madonna Coburn, told Ms.
Kinoy that she had walked in on Don Powers and a student and
witnessed "fondling or a blow job."  Ms.Kinoy said she asked
Madonna why she did not tell and Madonna told Ms. Kinoy that no one
believed her.  Ms. Kinoy did not know the name of the student who
had been seen with Don, but she understood that this former student
was now in jail.  Ms. Kinoy said she recently spoke with Madonna
and told her about the recent events at Austine School.  Ms. Kinoy
said she asked Madonna if what she told her had really happened and
Madonna indicated to her that it was true.  Ms. Kinoy again asked
Madonna why she did not tell and Madonna indicated that she was
afraid and would wait until others came forward.  Ms. Kinoy
understood that Madonna had confronted Don at some point and then
left Austine School before she was fired.  Ms. Kinoy did not have
an address for Madonna but said her family lived somewhere north.

Ms. Kinoy further stated that last summer, someone named Vicki
(last name unknown) told her how messed up Austine School was,
saying that Don Powers molested young boys and that this was
commonly known and discussed among people.  Ms. Kinoy also
identified Mary Bird, who is a social worker somewhere, as knowing
of past victims.  Ms. Kinoy said no one has disclosed their
victimization to her and she has only heard second hand
information.  She added that no current students have been named
to her.

On 5/16/96, this investigator had another contact with Ms.
Kinoy.  She said she had heard rumors that a current resident
assistant had made a disclosure either about being a victim or
knowing a victim of Don Powers and that Susan Sien was going to
fire the person for coming forward.  Ms. Kinoy did not know this
staff person's name.  Ms. Kinoy also said that residents in the
dorm were talking about Don Powers and that some were upset and
close to tears.  Ms. Kinoy said she thought Patrick Rosenberg, a
current student, may be a victim because she asked him what he
thought about the situation with Don Powers and he said "it could
be true."  Ms. Kinoy further stated that she believed there were
residents in the dorm who may have information or may have been
victims, because Don Powers had "pets and favorites."

On 5/17/96, while talking with Detective Steve Rowell about
another matter, he indicated that a source of his had heard that
Don Powers was under investigation and on administrative leave for

A 2458

000013

current abuse of students.  Detective Rowell's source did not have any names of current victims.

During a telephone contact with Kathy Gent on 5/20/96, she said Richard Virkstis, who is the Director of Development, attended alumni weekend at Austine School.  She said he spoke with former students who confirmed there had been sexual activity between Don Powers and students.  However, everyone with whom Mr. Virkstis talked, denied their victimization by Don Powers and gave Mr. Virkstis names of others who were possible victims.

## INTERVIEW WITH STEVE MOSHER:

On 5/21/96, this investigator interviewed Steve Mosher at the Social Services District Office in Brattleboro.  Laurie Meyer was the interpreter.  During this meeting, Mr. Mosher said he had been sexually abused by 3 staff at the Austine School when he was a student there.  Mr. Mosher named Don Powers, who he identified as his coach and shop teacher; a man named Phil, identified as a dorm supervisor, whose last name he could not remember; and another man named Andrew, identified as an assistant in the dorm, whose last name he could not remember.

In reference to abuse by Don Powers, Mr. Mosher provided the following information:  Mr. Mosher was a student at Austine School starting in the fall of 1979 and continuing into 1982 when he graduated.  Mr. Mosher indicated that there had been numerous incidents of sexual abuse by Don Powers that occurred in a boiler room at school (4 times), in the gym locker area (5 times) and at Don Powers' home in New Hampshire (4-7 times).  Mr. Mosher indicated that the sexual contact involved mutual masturbation and oral sex performed on Don.

Mr. Mosher explained that Don had been his JV basketball coach as well as his shop teacher.  He said that the abuse started in the shower with Don looking at him.  Mr. Mosher described this as a "come on thing" and said nothing else happened due to 12 other students being in the shower at the time.  Mr. Mosher also explained that at some point, when other students were not present in the shower, Don told him, "you've got a great body."  Mr. Mosher denied that physical contact occurred between him and Don Powers in the shower.

Mr. Mosher said physical contact with Don started in the fall of 1980 in a boiler room at Austine School.  This room was next to Don's shop.  Mr. Mosher said Don had told him he should pull down his pants and that his and Don's pants were down.  Mr. Mosher initially said Don "forced" him to "lick off candy" from his penis. He then explained that he was using a metaphor and that he did not actually lick candy but that Don had him lick his penis with his tongue and Don had said it was "like licking candy."  He then said:

13

Don did not physically force him, but described it as "more like begging." Mr. Mosher said Don would tell him, "I'll teach you." Mr. Mosher indicated that they also masturbated each other during this incident.

Mr. Mosher indicated that some incidents involved him and Don masturbating each other with their hands. This resulted in Don ejaculating. Mr. Mosher said on 3-4 occasions, Don "forced" him to perform oral sex and this was described as Don pulling on his head. Mr. Mosher said Don did not perform oral sex on him. Mr. Mosher said Don would ejaculate into his hand or into a towel but he never ejaculated during oral sex.

Mr. Mosher said he had Don for shop class in 1981. Don had given him an F for a grade. Mr. Mosher indicated that Don offered to give him a better grade in exchange for sex. Mr. Mosher said he had been a student with Don for a number of years. It was not clear to this investigator if Mr. Mosher received other poor grades that were raised in exchange for sex.

Mr. Mosher said Don would invite him to his home in New Hampshire. They would unload lumber from Don's truck and then they would have sex. At that time, Don lived alone. Mr. Mosher said Don would say, "please, please" when wanting to have sex with him. Mr. Mosher said he was afraid they would get caught, but Don told him not to worry because he had done it many times. Mr. Mosher said Don had abused other students at Austine School. When asked who else Don had abused, Mr. Mosher named Arthur Challis, John Russell, someone named Chris and someone named Travis. When asked how he knew that all of them had been abused by Don, he said they had all said they were gay because they had been molested at Austine School. He then said none of them had ever identified Don as the perpetrator. He added that he had talked with Arthur Challis a long time ago and that Arthur said other boys had sexual contact with him.

Mr. Mosher said Don told him not to tell anyone and threatened that if he told, he (Don) would pick on him and would say he (Mr. Mosher) initiated the sexual contact. Mr. Mosher said this is why he was quiet for many years. Later in our meeting, Mr. Mosher also said he had not realized that he had been sexually abused. He said after going to a three day conference last year, he found out he could sue for what happened. He explained that he did not come forward sooner because he had gotten the message that the sexual contact was okay and was not a big deal. He added that he tried to come forward a year ago but had not know who to contact. He said a friend had told him to go to the police, but he had not wanted to do that.

Mr. Mosher said at the time of the abuse, he told administrators at the school about it. In 1981, he first told John Fish, who was Dean of Students. He said he told Mr. Fish that

14

000015

A 2460

"teachers touched" him and asked what he could do to stop it.  Mr. Mosher said he had not told Mr. Fish about the oral sex with Don or about the extent of the touching.  He said he just said "touching" and pointed to his genitals when he told Mr. Fish.  Mr. Fish told him he needed to talk with Mr. Stevens, who was the principal, and with Mr. Lane, who was the Headmaster.  Mr. Mosher indicated that there was then a series of meetings and during one of the meetings with the 3 administrators, he had been told that the "teachers don't do that" and that Don is a "great guy."  Mr. Mosher indicated that several months later, another student, John Russell, had accused him (Mr. Mosher) of having sexual contact with him.  Apparently, Mr. Mosher then met again with the three administrators who challenged his allegation against Don in light of John Russell making allegations against Mr. Mosher.  Mr. Mosher indicated that he was then suspended from school for two weeks.

Mr. Mosher said he had been suspended from Austine School on three separate occasions for "sex."  He then said John Russell was the only one who had spoken up and that the other suspensions were for fighting with staff and other students.

Mr. Mosher indicated that in 1981, he also told his mother, Phyllis Mosher, about the sexual abuse.  Mr. Mosher said he told his mother that there was too much tension and sex happening at Austine School but that his mother wanted him to stay in school because she had paid for him to attend the school.  He said he had told his mother about "touching" but did not go into detail until after graduation.  At that point, when he was 22 or 23 years old, his mother then told his siblings.  Mr. Mosher said his mother is now deceased.

In reference to sexual abuse by the staff person named Phil, Mr. Mosher said he could not remember Phil's last name but described him as Italian.  Mr. Mosher said after he would complete his homework, Phil would tell him to meet him upstairs at Hoyton Hall.  During their meetings, they would masturbate each other.  Mr. Mosher said Phil initiated this contact and that it started with Phil rubbing his shoulders.  Mr. Mosher said some force was involved and described this as Phil pulling on his hand to make Mr. Mosher grab his penis.  This contact occurred in 1981 or 1982.  Mr. Mosher said he never told about Phil because of the "hassle" after he had told about Don.  He also said Phil was an assistant to the dean as well as a dorm supervisor.

Mr. Mosher also described sexual contact that occurred between himself and the staff person named Andrew, who had been a substitute in the dorm.  He said one or two times, but not more than three times, Andrew looked at him and then grabbed him and masturbated him in the shower.  Andrew did this during shower checks and when Mr. Mosher was alone.  Mr. Mosher said Andrew would tell him to come over and would then masturbate Mr. Mosher as he stood in the shower and as Andrew remained dressed standing outside

000016

A 2461

the shower. Mr. Mosher said that he had been an emotional mess and had been afraid he would get into trouble. He said he had tried to push Andrew's hand away. Mr. Mosher said he had not told about Andrew because he (Mr. Mosher) had given up.

Mr. Mosher said that after graduating from Austine School he told other alumni about Don abusing him. Mr. Mosher said he was recently contacted by several people who said Don had been accused of sexual abuse. He called Austine and was asked if he wanted to meet to talk about what happened. Mr. Mosher indicated that he had also called Jimmy Challis and asked if Don was in trouble. Mr. Challis confirmed this but said he could not give him details. He said he told Mr. Challis that Don had touched him and Jimmy said he should talk with an investigator or with Kathy (Gent).

Mr. Mosher indicated that if Don Powers were interviewed, Don might admit to what happened due to feeling guilty. Mr. Mosher said he hoped Don Powers would be thrown out of Austine School. He said he has not had contact with Don Powers since 1982. He also said that one time, Don told him he was sorry about the past and that he had just wanted to help Mr. Mosher be a better student.

Mr. Mosher expressed a lot of anger over his experiences at Austine School and indicated that his life had been ruined. He complained that many former students called his home to invite him to gay bars and gay events. His wife answered and spoke with these people. When his wife told these people that he was not gay, the callers said that he was and had been with them. He said his wife then left him and took their child, fearing he would abuse their child. He told his wife that he was not gay and that he had been a victim. He indicated that he is very angry at Austine School and at Don Powers for ruining his life, saying he had been touched by Don and other staff as well as by students.

On 5/21/96, this investigator had contact with Karen Richards, who is an attorney representing the Department of Education. Ms. Richards expressed concern over the level of complaints of sexual abuse coming out of Austine School. Ms. Richards informed this investigator that Susan Sien had resigned and that Dominick Bonura would be acting Executive Director in Ms. Sien's absence. This investigator understood that Ms. Richards and her associates would be meeting with Austine staff in order to make their own assessment of the situation.

On 5/22/96, this investigator had contact with an anonymous source who said she had been employed at Austine School twelve to fourteen years ago. This person said that at the time, a child had confided in her that Don Powers had been physically abusive to him. This person explained that Don had been the child's basketball coach. While holding the child down, the child's neck had gotten hurt. This caller said that both Don and the student had lost their tempers and it got physical. The caller believed the

16

incident was covered up.  The caller would not identify herself or
the student.  She commented that she had also heard rumors of Don
having sexual relationships with boys.

Note:  This investigator had numerous contacts with Richard
Virkstis, who is the Director of Development at Austine School.
Mr. Virkstis and/or Kathy Gent provided this investigator with a
great deal of information, including names of possible victims and
other informants, as well as written documentation of interviews
they conducted.  The following is a list of names of people who
were interviewed either by Ms. Gent or Mr. Virkstis and summaries
of statements made by these people:

1.  Bill Hudson, current school board member and former
student identified as a possible victim.  When contacted
by Ms. Gent, he denied victimization by Don Powers.  He
indicated that he thought it was "deaf rumor" and "hard
to believe."

2.  Luke Poquette, former student identified as possible
victim.  When contacted by Mr. Virkstis, he denied
victimization by or involvement with Don Powers, although
he indicated he had heard rumors in the past about others
being involved with Don.

3.  Jimmy Challis, identified as a witness to sexual abuse.
He indicated to Kathy Gent that he had talked with his
younger brother, Arthur Challis, who is in jail in MA and
that Arthur had told him that Don Powers sexually abused
him as a child.

4.  David Lunderville, identified as a possible victim.
During his contact with Mr. Virkstis, he said he had not
had personal experience with Don Powers, although he had
heard rumors about Don having a relationship with Mark
Limoges (a former student and current staff person).

5.  Tim Hughes, identified as a former student.  He indicated
to Richard Virkstis that he did not know people who had
been victimized and had only heard rumors about Don and
Mark Limoges, as well as suspicions raised about Luke
Poquette, who spent a lot of time with Don.

6.  Steve Regan, identified as a former student and a former
staff person.  He told Mr. Virkstis that he had no
personal knowledge of students being sexually involved
with Don Powers, although he knew there had been some
experimentation by students in the dorms.  He had also
heard rumors about Don Powers and Mark Limoges being
homosexual.

17

000018

A 2463

7.     Steve Mosher, identified as victim. He told Mr. Virkstis about Don Powers' sexual abuse of him, which included the following incidents:  In November, 1980, while at a basketball practice, he and Don undressed and went to the shower.  Don admired his body and said he wanted to touch Mr. Mosher's penis.  He told Don he did not want to get caught and Don told him not to worry because he had done it before with other students and had not been caught. Don kept asking Mr. Mosher to masturbate him and he continued to say he did not want to, but Don forced him. Mr. Mosher told Mr. Virkstis that this activity occurred 4 times with Don in 1980 and that he was also masturbated by staff named Phil Tintendo and Andrew Cunningham.  Mr. Mosher described that Don forced him to masturbate him in the locker room in the gym.  Contact with Phil and Andrew occurred in the dorm on the weekend and in the furnace room in the advanced boys dorm.  In 1981, sexual abuse happened in the boiler room near the wood shop and in the locker room.  Mr. Mosher said he had gotten an F on his report card and Don offered to change his grade to a B- in exchange for oral sex ("popsicle").   Mr. Mosher said this happened three times, that he had low grades each quarter and had to give Don sex to improve his grade.  Mr. Mosher said he performed oral sex on Don during each incident in the boiler room in 1981.  Mr. Mosher further stated to Mr. Virkstis that sex in the locker room that year involved both masturbation and oral sex.  Mr. Mosher also said he was forced to do this at Don's home.  Mr. Mosher said one time he spent the night at Don's home and Don asked him for "popsicle" sex.  Mr. Mosher denied that Don performed oral sex on him.  Mr. Mosher said in 1981, he told Mr. Fish that Don had touched him several times and that Mr. Fish said "don't be silly " but agreed to talk with Mr. Stevens and with Mr. Lane.  When he later met with Mr. Lane, Mr. Lane denied that the sexual abuse was possible.  Mr. Lane also said he would talk with Don Powers, but there was no follow up.  Five months later, another student, John Russell, accused Mr. Mosher of sexual abuse and Mr Mosher was sent home for two weeks.  Mr. Mosher told Mr. Virkstis that in 1982, there were similar incidents with Don after school in the locker room, mostly in exchange for grades.  Mr. Mosher said that Don had approached in 1992 at Alumni weekend and had apologized for "touching" him.

Note:  Mr. Mosher was interviewed by Richard Virkstis on 5/21/96, which was the same day that this investigator interviewed Mr. Mosher.   This investigator met Mr. Mosher in the morning and understood that Mr. Virkstis met with Mr. Mosher in the afternoon. Statements Mr. Mosher made during our separate meetings were inconsistent.  Mr. Mosher indicated to Mr. Virkstis that sexual

18

000019

A 2464

contact with Don Powers included an incident in the shower during which time both of them were showering. Mr. Mosher had told this investigator that Don Powers had looked at him but had not had physical contact with him. Mr. Mosher was also able to provide the last names of the other staff people that he alleged had abused him, whereas during our meeting, Mr. Mosher said he could not remember their last names. Mr. Mosher told this investigator that the last time he saw Don Powers was in 1982. He described that Don had apologized for what happened in the past but did not make reference to the sexual contact. See written documentation for further detail.

8. Arthur Challis, identified as a victim. He was recently interviewed at the North Central Correctional Institute in Gardner, MA by Richard Virkstis. He disclosed that Don Powers had sexually abused him from the age of 11 to 17. Mr. Challis described an incident that happened when he was 12 years old. He said he had been at Don's home, which had been a mobile home and Don sent him out to work in the yard. Apparently, Mr. Challis then went into Don's bedroom at some point. He named other boys that were there and they were standing over the bed looking at magazines. Mr. Challis said Don "grabbed me on the butt" and then "reached around me and grabbed my genitals." Apparently, Don then asked if he wanted to look at the magazines. Mr. Challis also told about contact that occurred between him and Don in the intermediate boys' dorm. He referred to the area as the janitor's room. Mr. Challis also mentioned contact occurred when he was in the shower, mostly on weekends. He described an incident in which Don told him to take off his towel and then Don exposed his penis to Mr. Challis. Mr. Challis said Don asked him if he wanted to touch his penis and said it was "just like in the magazine." He said Don made him touch his penis and it became erect. Mr. Challis said Don asked him to give him a "blow job" and Mr. Challis admitted he put Don's penis in his mouth. Mr. Challis also told about an incident in which he was at Don's house and Don fondled him and said he wanted to "blow" him. It was not clear if Mr. Challis was 14 or 15 or 16 years old when this incident occurred. Mr. Challis also told about Mark Limoges exposing his erect penis to him and asking Mr. Challis if he wanted to touch it. Mr. Challis was 12 or 13 years old at the time and he believed Mark Limoges was possibly 15 years old. Note: Mr. Challis refused to talk with SRS. See SIU case file for copy of transcript of TTY interview that Mr. Virkstis had with Arthur Challis. This transcript of their meeting documents that Mr. Challis willingly met with Mr. Virkstis and without

19

threat, coercion or the promise of favors, Mr. Challis made disclosures of abuse that appeared to be and unrehearsed.

9.  William Werden, identified as a victim. He was interviewed by Richard Virkstis, who explained to him that his name had been mentioned by two former students who disclosed abuse by Don Powers and that these students also said he (Mr. Werden) had been a victim. Mr. Werden indicated that he had been aware of the sexual behavior going on but initially denied that he had been involved. Mr. Virkstis then brought out some Austine year books and as Mr. Werden "reflected" on the pictures, he identified three other students whom he said were involved with Don Powers: Gary Moran, Stuart McKenna and Ron Chaffee. Mr. Werden did not give details about what occurred between these students and Don Powers. Mr. Werden then indicated that Don used to invite him to his house to do work. Mr. Werden described that Don wanted to teach him about masturbation and then proceeded to masturbate him. Mr. Werden initially denied further involvement with Don, but later admitted that there had been sexual activity on other occasions and that Don performed oral sex on him. Mr. Werden did not admit to reciprocating this activity with Don. Note: See write up from this investigator's interview with Mr. Werden for inconsistencies in statements he made.

10.  Ronald Chaffee, identified as a victim. He indicated that Don Powers sexually abused him during 1988, 1989 and 1990. He stated that incidents of abuse occurred at Don Powers' home in Swanzy, NH and on Austine School grounds; however, he did not give details about what the abuse involved. See write up from this investigator's contact with Mr. Chaffee.

11.  Chris Perreault, identified as a victim. He indicated that Don Powers sexually abused him when he was 17 years old. The abuse involved mutual masturbation and oral sex. Note: Mr. Virkstis indicated to this investigator that Chris Perreault had psychiatric problems at the end of his school career. Mr. Virkstis did not have details about this. See write up from this investigator's interview with Mr. Perreault.

12.  Jeffrey Rowland, identified as a victim. He denied sexual abuse by Don Powers, but said when he was a student at Austine, he had sexual contact with other students and with a staff person named Cliff.

Note:  See written documentation of interviews in SIU file.

20

During a meeting with Richard Virkstis on 5/21/96, he said an administrative team meeting was held when allegations of abuse were made against Don Powers. At that time, Susan Sien was not anxious to address the issue with Mr. Powers. The administrative team later met with Mr. Powers and informed him of the allegations and told him he needed to be on administrative leave. Mr. Virkstis said Mr. Powers was embarrassed and asked Susan Sien why, saying this had come up before. Mr. Virkstis said Ms. Sien apparently had received an anonymous letter in the past that she had not shared with the team. Mr. Virkstis expressed concern about how much Ms. Sien had known and when. Mr. Virkstis further stated that when Mr. Powers went on administrative leave, he asked Ms. Sien if he could clean out his apartment on campus. Ms. Sien gave permission for this. Mr. Virkstis expressed concern over not knowing what forms or documents Mr. Powers may have taken. Since Mr. Powers cleaned out his apartment, Alona Ohlson, who was acting in Mr. Powers' absence, had given her resignation and was upset that records were missing. Mr. Virkstis further stated that resident assistants have told Ms. Ohlson that reports of abuse had been made to Mr. Powers that he then did not report. Mr. Virkstis also said that he was told by a person that he cannot identify that when Mr. Powers was a student at Austine, Mr. Powers was abused by a former administrator. Mr. Virkstis understands that the administrator resigned when he was threatened with public exposure if he did not resign. Mr. Virkstis expressed great concern over the number of students Mr. Powers has had contact with over the years. He also expressed concern over Mr. Powers' hiring practices and said he hired resident assistants for years who were not educated and had no knowledge of child development or human sexuality.

On 5/22/96, Richard Virkstis provided this investigator with another mailing address for Ronald Marsh. On 5/31/96, this investigator sent another letter to Mr. Marsh, but that letter was returned by the postal service with the explanation that authorized time to forward had expired.

On 6/7/96, this investigator had contact with Dominick Bonura, the acting Executive Director of the Austine School. Mr. Bonura said that Don Powers had been asked to resign and that as of 5/29/96, he had resigned from his position at the Austine School. Mr. Bonura expressed concern over learning that Mr. Fish, who is still on staff, had not reported the abuse that reportedly had been revealed to him years ago. Mr. Bonura indicated that he did not know if Mr. Virkstis had talked with Mr. Fish after this information surfaced.

On 6/7/96, this investigator sent a letter to Don Powers informing him that there had been allegations of sexual abuse by him and requesting a meeting with him. See letter dated 6/7/96 in SIU file. On 6/17/96, Mr. Powers responded to this letter, but

21

000022

A 2467

this investigator was not able to contact Mr. Powers until 6/18/96. Mr. Powers then referred this investigator to his attorney, Richard Carroll.

On 6/19/96, this investigator had contact with attorney Richard Carroll. Mr. Carroll said that Mr. Powers had not been given names of any of the involved students. He said Mr. Powers had been told that the state recommended his dismissal and he was then asked to resign. Mr. Carroll also inquired about criminal charges. This investigator explained SRS investigative procedures to Mr. Carroll and informed him that the police were not currently involved since none of the identified victims were 24 years old or younger.

On 6/20/96, this investigator interviewed Don Powers at the Social Services District Office in Brattleboro. Tupper Dunbar interpreted. Mr. Powers' wife, Judy, and his attorney, Richard Carroll, were present. Mr. Powers indicated that he understood the purpose of our meeting was to give him an opportunity to respond to allegations of sexual abuse against him. Mr Powers said he had not been told anything about what happened and that he had only heard rumors that he was involved with homosexuals and children.

Mr. Powers said he was first hired to work at Austine School in September of 1972 by Mr. Lane. He started as an after school activities coordinator and also held a position in the intermediate boys' dorm. Over the years, he has been a coach and shop teacher and most recently, was Dean of Students. He said he worked at Austine School for a total of twenty-four years. Mr. Powers indicated that he could not imagine why anyone would make allegations against him. He said he always thought he was well respected and had no idea who would have a grudge against him.

Mr. Powers indicated that he had been a basketball coach for seventeen years. When asked about his relationship with Steve Mosher, Mr. Powers said he did not understand and asked this investigator what was meant. Mr. Powers appeared to hesitate before he responded. Mr. Powers then asked, "Steve Mosher...?" and appeared puzzled. Mr. Powers indicated that Steve had transferred from the Beverly School for the Deaf. He was Steve' basketball coach. He described Steve as a good player and a natural athlete and indicated that he had gotten along very well with Steve. Mr. Powers further stated that when he was the head coach and Steve Butterfield was the assistant coach, there had been an incident with Steve Mosher and John Russell, who was another student. He explained that it was necessary to keep a watchful eye on the boys because they had been sexually involved. Mr. Powers then described that when he had become the head coach, the team went to Rochester, NY, for a game. Mr. Powers said there had been a bad storm and they were late returning. Mr. Powers drove the bus. When they returned, his assistant coach, Harold, said a number of boys on the bus caught Steve Mosher and John Russell necking in the dark. The

A 2468

000023

two boys were then confronted and were told that the incident needed to be reported to Mr. Stevens. Mr. Powers said he reported the incident, but did not know what happened. Mr. Powers added that he did not think this incident carried over into his relationship with Steve Mosher and they got along okay with no problems between them.

Mr. Powers denied ever having Steve Mosher at his house. Mr. Powers acknowledged that other students had visited him at his home, but not Steve. When asked who visited him at his home during the time period that Steve had been a student, Mr. Powers named Stan Sanders (his wife's son), Steve Regan and Frank Baker. Mr. Powers then said he misunderstood this investigator's question. This was right after Mr. Powers' wife, Judy, communicated something to him. Mr. Powers then said he could not remember who had visited him at his home when Steve Mosher was a student. Mr. Powers indicated that prior to fifteen years ago the school was "not crazy about" students going to the homes of staff. When asked what reason students might have for visiting his home, Mr. Powers said he has a construction business and there were some students who needed money and he sometimes needed help.

Mr. Powers denied that he had ever showered with any of his students. Mr. Powers said the boys changed and showered in their dorm before going to the gym. This was the preferred practice. He then said the boys rarely showered in the gym locker room. Mr. Powers initially said he never saw the boys shower and added that at go away games, staff supervised and checked on the boys when they showered. He said he always had an assistant coach and either he or his assistant checked on the boys when they showered at go away games. Mr. Powers said in the dorms, the residential advisors monitor students in the showers.

Mr. Powers said he could not remember if he had Steve Mosher as a student in wood shop. Mr. Powers said he never gave an F to any student and then said he rarely had given an F for a grade. He said he also taught math class.

Mr. Powers acknowledged that there was a boiler room next to his wood shop. He denied that he had ever been in the boiler room with Steve Mosher and said there would be no reason for him to go into that room. He added that he did not have a key to the boiler room and that he only had a key to his wood shop and to the entrance of the building.

Mr. Powers indicated that he recalled Steve Mosher as a student during 1980, 1981 and 1982. He said he did not remember having any words with Steve Mosher during an alumni gathering. He denied that any administrator had spoken to him about Steve's allegations. He denied that he had any sexual contact with Steve Mosher.

23

A 2469

000024

In reference to Arthur Challis, Mr. Powers said he had known Arthur as a student when he was a residential advisor. This was during the time period of 1972 to 1974 or 1975 when Arthur was 12 or 13 years old. Mr. Powers described Arthur as "difficult" and said it was very clear that Arthur "liked boys." He said Arthur "acted effeminate" and touched or tried to touch other boys. The other boys complained about Arthur. Mr. Powers said he talked with Arthur about this and tried to work on boundaries with Arthur. He said Arthur got mad about this. He said Arthur was not a bad kid but was annoying to others. Mr. Powers said he always had to deal with Arthur on this and Arthur thought he was picking on him. Arthur complained to his family about this and his family talked with Mr. Powers about picking on Arthur. He said he was just doing his job. Mr. Powers said he did not see much of Arthur when Arthur got older. He said Arthur graduated in 1980. Mr. Powers denied sexual abuse of Arthur Challis.

Mr. Powers indicated that he had first become aware of allegations against him during a meeting with Susan Sien and Kathy Gent on 4/28/96. Ms. Sien had told him that something had been reported to have happened years ago involving sexual molestation. Ms. Sien had also told him that SRS had said he could continue working. On the following Wednesday, during an administrative meeting, people on the team said that due to rumors and history about his sexuality in the past, he should be on leave. When asked what he meant when he reportedly told the team "this has come up before", Mr. Powers said he was referring to the earlier meeting during which he had first been told about the allegations. He said personally, he had never heard any rumors. Mr. Powers said it was decided that he should be on administrative leave with pay and he accepted. Mr. Powers said he was later told by Dominick Bonura that there were four known victims and that the state had mandated he leave. Mr. Powers indicated that he was then asked to resign and did so effective 5/30/96.

When asked what he knew about an anonymous letter being sent to the school, Mr. Powers said a letter had been sent to Susan Sien approximately two and one half years ago. Mr. Powers said the letter started out with a positive tone about the good work he had done with parents. The last paragraph, however, complained that he was moody and mentioned rumors that he had molested children twenty years ago. Ms. Sien said she did not believe what was in the letter and was not going to go forward with it. Mr. Powers believed that either Ms. Sien still has the letter or it was thrown away.

When questioned about wrestling in the dorm, Mr. Powers looked puzzled. Mr. Powers recalled an incident in the dorm several years ago in which children in the dorm had playfully attacked him. He added, however, that wrestling was not allowed. He denied that he ever grabbed the genitals of boys or that they ever grabbed his genitals.

24

000025

A 2470

On 6/21/96, this investigator contacted John Fish, a current staff person at the Austine School. Mr. Fish said he remembered Steve Mosher as a student, but did not remember Steve making any complaints about staff at the school. He further stated that he did not remember Steve making any allegations of sexual abuse against Don Powers and he had no recall of any meeting between himself, Mr. Lane and Mr. Stevens and Steve Mosher to discuss any allegations of abuse. Mr. Fish said he did not remember Steve Mosher being suspended from school and said the only disciplinary incident he recalled was Steve possibly getting violent in the dorm. Generally speaking, he remembered Steve as an easy going and friendly student who was average.

Mr. Fish further stated that he did not remember Steve Mosher going to Don Powers' home. He did recall, however, that Don Powers had some students go with him to help with his business. When asked what the school policy would have been regarding students going to the homes of staff people, Mr. Fish said the policy should have involved getting parental permission. The bus responsible for transporting students would also need to be informed if a student were not going to be on the bus going home. There may also be some indication in a student's file if there had been parental permission granted to go home with a staff person. Mr. Fish said information on former students would be contained in the "dead files."

Mr. Fish confirmed that there is a boiler room next to where Don Power's work shop had been. This room would have been overseen by the maintenance department. Mr. Fish initially said that as a coach, Don Powers' key would fit the lock to the boiler room. He explained that there is a master key that fits most of the school's locks and that he has one and that Don Powers would have one, also. However, during our conversation, Mr. Fish offered to try his key in the boiler room lock and he did so, but it did not fit.

Mr. Fish said there are gang showers in the gym as well as in the dorm at Austine School. He said the student athletes always changed and showered in the dorm before going to the gym or after returning from the gym because it was easier due to the close proximity of the dorm to the gym.

Mr. Fish further stated that he remembered Arthur Challis as a nice boy and a good student and soccer player. He described Arthur Challis as conscientious and getting along well. He did not recall disciplinary problems with Arthur nor did he recall any sexual acting out problems with Arthur.

On 6/21/96, this investigator contacted Richard Lane, the former Headmaster of Austine School. He said he remembered Steve Mosher as a big "overgrown" kid in whom his parents took a lot of interest. He said he did not remember Steve Mosher complaining

25

000026

A 2471

about Don Powers touching him or sexually abusing him. He said if there had been any allegations about any staff, he would have dismissed the staff person. He said he had known Don Powers as a student and described him as an "exemplary student" and as a "leader." He said he hired Don after he had completed college and that there had never been any concerns raised about Don.

Note: During contacts with Richard Virkstis, this investigator requested access to and/or information from Steve Mosher's closed school records in an attempt to corroborate information that had been gathered. However, according to Mr. Virkstis, he was not able to find Steve Mosher's records due to old school records being unorganized and improperly filed.

During a contact with Richard Virkstis on 6/26/96, he said he had contacted William Werden, a 1992 graduate from Austine School. Mr. Virkstis said he had contacted Mr. Werden for the purpose of asking him if he had been victimized by Don Powers. Two former students had given Mr. Werden's name to Mr. Virkstis. When Mr. Virkstis met with Mr. Werden, Mr. Werden initially denied that he had been victimized by Don Powers, but he mentioned the names of other former students who were victims: Ron Chaffee, Gary Moran, Stuart McKenna. Mr. Werden had indicated that he had witnessed the victimization of these students and then became vague and did not give any details. Mr. Virkstis said he believed Mr. Werden was hesitant about what information he should give about these former students. Mr. Werden then indicated that he had been a victim of Don Powers and that his abuse began with masturbation when he was 14 years old. Mr. Virkstis did not know if there had been mutual masturbation between Mr. Werden and Don Powers. Mr. Werden had also indicated that he had received oral sex from Don Powers. He first indicated to Mr. Virkstis that this occurred 2 times and then said it was several times. Note: Mr. Virkstis described William Werden as intellectually limited. Also see written documentation provided by Mr. Virkstis regarding his meeting with William Werden.

On 7/1/96, this investigator contacted Patricia Werden, William Werden's mother, and confirmed a meeting time with Mr. Werden for 7/2/96. Ms. Werden thought this investigator was meeting with her son for the purpose of discussing his SSI benefits. This investigator explained that the purpose of the meeting involved allegations of inappropriate behavior by staff at Austine School. Ms. Werden confirmed that her son had been a student at Austine, first as a day student and then as a dorm resident starting at age 4 or 5. He came home on weekends when he was a dorm student. Ms Werden said her son never made any complaints about staff. She added that once in awhile, he had general complaints, but described these complaints as nothing major. He used to talk regularly with the school counselor, Jim Bombicina, who was his confidante. She believed her son would have told Mr. Bombicina about any problems he was having.

26

A 2472

000027

## INTERVIEW WITH WILLIAM WERDEN

On 7/2/96, this investigator and Detective Rick Andrews interviewed William Werden in the Brattleboro Social Services District Office. Laurie Meyer interpreted. Because of Mr. Werden's current age (24 years old), this investigator requested police assistance so a criminal case could be prepared if warranted by the gathering of sufficient information. Note:  During this interview, Mr. Werden appeared to be confused about what he was told by Mr. Virkstis about the victimization of other former students as opposed to what he actually witnessed happening or was told by past victims.  Much of the meeting time was spent on clarifying questions to Mr. Werden or clarifying his responses to questions.

Mr. Werden said Richard Virkstis had contacted him and asked him to come to Austine School regarding something to do with Don Powers.  Mr. Werden then indicated that Don Powers had sexual contact with students other than himself.  He then named Ronald Chaffee, Gary Moran and Stuart McKenna and indicated that he knew Don Powers had sexual contact with these three students.  He then named Tim Hughes, another student, and said something about pictures out of the year book.  Note:  Richard Virkstis had previously told this investigator about a 1992 year book that belonged to Don Powers which had several pictures of students cut out.  Mr. Virkstis had wondered if student cut out of the year book had been victims of Don Powers.

When asked how he knew that the aforementioned students had been victimized by Don Powers, Mr. Werden began by talking about Ronald Chaffee.  Mr. Werden explained that Don Powers had asked Ron to come into his office to talk about something private.  Mr. Werden then said he could not see through the window so he did not know what happened.  He then said he saw and heard Ron and Don Powers talk and agree about something and Don used the sign "private." Mr. Werden then began talking about students wrestling on the ground and that Don Powers wrestled with young kids on the floor and the kids got emotional and this is how Don Powers had contact.  Mr. Werden then said he never saw any wrestling with Don Powers.  Mr Werden then said he heard about sexual contact, but did not see it and did not see through the door (regarding Ron Chaffee) and that some kids told him about sexual contact.  Mr. Werden said the other two students he mentioned had emotional problems.  He went on to say that Don Powers held them down and tried to handle them and he probably held them and touched the lower parts of their bodies.  Mr. Werden said someone told him this and when asked who he said probably a student told him.  Mr. Werden then said he saw Don Powers wrestle with Gary and saw Don touch Gary "near the balls."  Upon further questioning, Mr Werden described that Don had his arms around Gary's mid-section but he never saw Don touch Gary's penis or genital area.  Mr. Werden then said he wanted to tell us an opinion.  He then stated that Mr. Virkstis told him

A 2473

000028

about the shower room when playing in the gym. He further stated that Mr. Virkstis said Don went into the shower and had sexual contact with students, but he (Mr. Werden) did not know about it. Mr. Werden then said there were other kids Don had sexual contact with but not with him (Mr. Werden). No other kids told him about sexual contact in the showers. Then Mr. Werden said students told him that Don Powers had sexual contact with them. When asked who told him this, he named Mike Carter and Stuart McKenna. When asked what Mike told him, Mr. Werden said Mike told him that other kids had sexual contact with Don but that he (Mike) had not. Then Mr. Werden said Mike said he had sex and it was great. Mr. Werden then said Mike said he had heard rumors.

When asked about his experiences with Don Powers, Mr. Werden said he had gone to Don Powers' house when he was 16 years old. This was in 1987. He explained that he had been scraping the roof and sanding the floor at Don's house in Keene, NH. He said Don had done something to him that was "wrong" , and that he "jerked me off." He indicated that Don had used his hand, not his mouth. Mr. Werden indicated that this was why Don had cut out pictures from his 1991 year book. It was not clear how Mr. Werden knew this or why he believed this to be the reason. He denied that any sexual contact with Don occurred in Brattleboro and he denied that he had done anything to Don.

Mr. Werden initially said he had been at Don's home on two occasions. He indicated that the first time he had been at Don's house, Don masturbated him. He said it was probably in the Fall and that he had probably been outside near the corner of the house. During the second visit to Don's home, nothing happened.

When asked what Don said before masturbating him, Mr. Werden initially said he did not remember. He then said he (Mr. Werden) had been sanding inside the house and Don came to where he was and said he wanted to show him how to "jerk off." Mr. Werden said he did not say anything to Don and just went along with Don. Mr. Werden said contradictory things about trying to stop Don, but that he did not because he did not tell Don to stop and that he had not known that sexual contact would happen. He said he never said no to Don. Mr. Werden indicated that he probably did not say no to Don because he had not had enough courage to say no. Mr. Werden said Don had expected to do it but he (Mr. Werden) had not expected the sexual contact. He said he could have told Don to stop but he did not do that. He said he believed Don would have stopped if he had said no. Mr. Werden said it had been his choice to go to Don's house and that sometimes he said no to going to Don's house. He went to Don't home because Don had needed help. Visits to Don's house were after school hours, not during the school day. He said he had gone to Don's house eleven to sixteen times over the years to help Don. Sexual contact with Don occurred only one time. Mr.

28

000029

A 2474

Werden denied that sexual contact with Don occurred at Austine School or in Brattleboro, VT. Mr. Werden said Don only used his hand to touch him.

When asked about his meeting with Richard Virkstis, Mr. Werden said he had gone to his office and "that's when he told me." Mr Werden then said he had not known what happened at Austine School. Mr. Werden indicated that Mr. Virkstis had talked about Don and other students and then had asked Mr. Werden some questions. He further said that he had been in shock and had not known. Mr. Virkstis told him all the names and showed him a sheet of paper with all the names on it and asked about those who had been named.

During a later contact with Detective Rick Andrews, he said he had referred the matter involving William Werden to Sergeant Lester Fairbanks of the Chesterfield, NH Police Department. Detective Andrews indicated that his understanding was that the matter would not be pursued in New Hampshire because the age of consent is 16 years old.

On 7/3/96, this investigator contacted Richard Virkstis and again cautioned him about questioning potential victims as well as advised that he not suggest the name of the accused to people he interviewed. During this contact, Mr. Virkstis said there has been indication given to him that Don Powers had contacted people and asked them not to say anything if questioned about Don. Mr. Virkstis also said that a woman named Linda Todd who used to work at Wheeler House as a case manager had indicated that eight people confided that they were victims of someone. Apparently, Ms. Todd had also indicated that another staff person should be investigated as a perpetrator. Mr. Virkstis was somewhat vague and said it was unclear if Ms. Todd was talking about Don Powers or this other staff person in regard to the alleged eight victims with whom she had spoken. Mr. Virkstis indicated that he would contact Ms. Todd for more specific information.

On 7/24/96, this investigator had a meeting with Richard Virkstis and Dominick Bonura at the Austine School. Virginia Nolan interpreted for Mr. Bonura. During this meeting, Mr. Virkstis said he has been given indications that people are afraid and this is why they have not come forward sooner. Both Mr. Virkstis and Mr. Bonura said it is harder for deaf people to disclose abuse due to the small nature of the deaf community and because everyone knows everyone else and there is a sense of loyalty. They added that because deaf people do not see a consequence to Don, they feel threatened by his presence in the community.

Note: After several attempts to contact Mitchell Trombley by telephone, this investigator sent a letter to him on 7/25/96 regarding concerns he may have about behavior his son reportedly witnessed between Don Powers and current students in the dorms. Mr. Trombley never responded to the letter that was sent to him.

000030

A 2475

Note:   Richard Virkstis had told this investigator that Mr. Trombley intimated that his son may have witnessed Don Powers fondling students in the dorm.

## INTERVIEW WITH CHRISTOPHER PERREAULT

On 11/6/96, this investigator interviewed Christopher Perreault at the Social Services Office in Waterbury. Joan Pellerin interpreted. Initially, Mr. Perreault expressed that he was not willing to talk with this investigator, although he acknowledged that something had happened to him in the past when he was a student at the Austine School. Mr. Perreault expressed anger towards Arthur Challis, who he said he was mad at for giving out his name. Mr. Perreault was quickly persuaded to talk with this investigator after learning that risk to current students was being assessed. Mr. Perreault indicated that he had sexual contact with Don Powers. He further stated that this contact was initiated by Don Powers when he (Mr. Perreault) was 17 years old. Mr. Perreault said he had lived in the school dorm at the time. When asked for details, Mr. Perreault said he and Don Powers had sexual contact a few times and this occurred in Don's apartment in Brattleboro. He denied that they had sexual contact on school property. Mr. Perreault said he thought Don had sexual contact with other students on school grounds, but he was not sure. Mr. Perreault indicated that the contact he and Don had together included mutual masturbation and mutual "blow jobs", which was described as the mouth on the penis. Mr. Perreault explained that he had been friends with Don for a long time. He first met Don when Don was a dorm supervisor and he thinks he may have been 13 or 14 years old. Mr. Perreault said he was 17 years old and a junior when Don first approached him. He explained that Don came up to him and asked if he wanted sex. Mr. Perreaulat denied that Don ever made any threats or told him not to tell. Mr. Perreault said that he had been weak and had not wanted to hurt Don's feelings. He described Don as a friend and indicated that he had looked up to Don who had been his JV and Varsity coach. Mr. Perreault said sexual contact between him and Don did not occur during his senior year at Austine School. Mr. Perreault said he graduated in 1980 and then went to college. After college, he returned home. He later saw Don at various events, but has not seen him during the past four years. Mr. Perreault indicated that he started hearing rumors about Don, although it was not clear when he first heard the rumors. Mr. Perreault said approximately ten years after graduating from Austine School, he had heard rumors about Arthur Challis and Don. Later, Arthur told him about Don, but no one else has told him about sexual contact with Don. It was not clear to this investigator when Arthur and he spoke. He then got a letter from Dick Virkstis and met with Mr. Virkstis in August or September, 1996. During their meeting, Mr. Virkstis told him about the sexual abuse. Mr. Perreault indicated that he was afraid of revenge by Don.

30

A 2476

000031

On 11/8/96, this investigator spoke with Richard Virkstis.
Mr. Virkstis said prison officials may not have communicated to
Arthur Challis why this investigator had wanted to talk with him.
Mr. Virkstis also said that when he had met with Mr. Challis, Mr.
Challis had indicated to him that he was willing to talk with this
investigator.   Mr. Virkstis later contacted supervisor George
Karson and informed him that Arthur Challis had recently spoken
with his brother, Jimmy Challis, and had expressed interest in
talking with SRS.   See SIU case file for letter dated 12/6/96.
Note:  To date, this investigator has not had contact from Arthur
Challis.   In the event that Mr. Challis responds to the
aforementioned letter, it may be necessary to attach an addendum
to this report.

During this discussion with Mr. Virkstis, he suggested how
contact could be made with Ron Chaffee, another former student who
had been identified as a victim of sexual abuse by Don Powers.
This investigator was given the name of Rene Pellerin, who is Mr.
Chaffee's vocational rehabilitation counselor.

This investigator asked Mr. Virkstis if there were any other
students who had been identified as victims of sexual abuse by Don
Powers.   Mr. Virkstis said a former student who is or has been on
staff said she had witnessed Don with a student when she was a
student at Austine.   This person asked that her name not be
repeated.   This investigator told Mr. Virkstis that both he and
this staff person were mandated to report suspected abuse.  Mr.
Virkstis said he did not know the name of the student who was
allegedly seen with Don; however, he revealed that the staff
person's first name was Madonna.   Mr. Virkstis agreed to contact
this person and instruct her to make a report.   Mr. Virkstis
further stated that during the initial stage of the investigation,
another former student, Robert Boggess, came forward and reported
to Mr. Virkstis that he had sexual contact with Don.  However, Mr.
Boggess then recanted this.  Note:  To date, "Madonna" has not made
a report to SRS.

On 11/11/96, this investigator contacted Rene Pellerin via
TTY.  Due to confidentiality concerns, Mr. Pellerin indicated that
he could not provide an address or telephone number for Ronald
Chaffee.   However, he agreed to ask Mr. Chaffee to contact this
investigator.

INTERVIEW WITH RONALD CHAFFEE

On 11/14/96, this investigator contacted Ronald Chaffee via
TTY.  This investigator also communicated with Rene Pellerin, who
assisted with communication.   During this contact, Mr. Chaffee
said he and Don Powers had sexual contact on numerous occasions
during a five or six year period of time when Mr. Chaffee was 13
years old and a student at Austine School.  Mr. Chaffee indicated
that abuse occurred both on school property and at Don's home near

31

000032

A 2477

Keene, New Hampshire. Mr. Chaffee said Don often made arrangements for them to meet in Don's campus apartment and Don would have him sneak out of his dorm room to meet him. Mr. Chaffee indicated that the sexual contact included masturbation, oral sex and anal sex. Mr. Chaffee indicated that the abuse started when he lived with Don, who was acting as a foster parent due to problems Mr. Chaffee had been having at home. Mr. Chaffee said he accepted the sexual contact from Don because Don threatened to kick him out as well as threatened to make another placement difficult for him to find. Mr. Chaffee said two other students, Ron Marsh and Tom Steere, told him about Don victimizing them. See SIU case file for TTY transcript dated 11/14/96 for further details.

On 12/5/96, this investigator met with Don Powers in the Social Services District Office in Brattleboro. His wife, Judy, and his attorney, Richard Carroll, were present. Janice Cagan-Teuber was the interpreter. This investigator provided Mr. Powers with the names of the former students who had made allegations of abuse against him. Mr. Powers denied that he sexually abused Steve Mosher, Arthur Challis, William Werden, Ron Chaffee and Christopher Perreault. When asked why these former students, all of various ages and in attendance at Austine School at different times would make these allegations if the allegations were not true, Mr. Powers indicated that there could be various reasons. He then explained that in 1990 or 1991, David Muse, who was the president of the Alumni Association, went to Susan Sien with concerns about him (Mr. Powers). At the time, an administrative meeting was called and Richard Virkstis attended that meeting. Mr. Virkstis told Mr. Powers not to worry, that the concerns involved "old stuff" that happened six or seven years in the past. Mr. Powers said he went directly to David Muse and learned that two boys, Arthur Challis and Kevin Hopkins, had shared information about him. Mr. Powers said Arthur Challis blamed him for his problems because he (Mr. Challis) was in jail. Mr. Powers said Arthur had accused him of "goosing" him at a basket ball game and that it led to his problems. Mr. Powers said that Kevin Hopkins said he had showered with him in the locker room. Mr. Powers denied that these events ever happened. Mr. Powers said he warned David Muse that if people persisted with these kinds of rumors, he would bring court action against them.

Mr. Powers said then, three years later, an anonymous letter was sent to Susan Sien. Mr. Powers commented that he believed staff thought the rumors were true because he sometimes took students out as a reward for good behavior. He added that he took both boys and girls out. Mr. Powers proceeded by saying that two years ago, Ken Lambert called him and asked if his wife was divorcing him. When asked why would his wife divorce him, Mr. Lambert said he had heard rumors that Mrs. Powers had caught Mr. Powers having sex with a guy. Mr. Powers said he followed up on this rumor and learned that Dominick Bonura's son and his brother shared information about his "history." When asked what he meant

32

by "history", Mr. Powers said that was the word that others had used in reference to him.  Mr. Powers then said that three years ago, Nancy Bonura worked for him at the school.  He indicated that they did not get along.  She then left and went to work for her father, Dominick Bonura.  Mr. Powers said that he then heard that Dominick wanted to get rid of him so he could bring his daughter Nancy back.  Mr. Powers further stated that Jimmy Challis and Dominick Bonura belong to a fraternity that is the rival of his (Mr. Powers) fraternity.  Mr. Powers then said that he had Clint Casella removed from Austine School and his father, Steve Casella, Sr. then said he (Mr. Powers) had abused children.  Mr. Powers added that Jimmy Challis worked with Clint Casella over the summer.

This investigator reminded Mr. Powers that at our last meeting, he had denied knowledge of rumors and could not think of any grudges people might have against him.  When asked why he had not discussed these concerns at our last meeting, Mr. Powers said he was shocked at our last meeting over the allegations and was trying to ignore the situation and this is why he did not previously bring up the rumors he had heard.  Mr. Powers further stated that at the time of our last meeting, he had not been aware of grudges against him; however, he was recently approached by friends who told him about these grudges.  Mr. Powers then complained that people have told him that they have told Richard Virkstis about Dominick Bonura being abusive in the past but that Mr. Virkstis has told these people he only wants to hear about Mr. Powers.  Mr. Powers identified these people as Jean Carr and Mark Limoges.  He then explained that Ms. Carr told him that Mr. Virkstis had wanted to speak to her about Ron Marsh.  Apparently, Ms. Carr tried to talk with Mr. Virkstis about Dominick Bonura hurting her and other students in the past but Mr. Virkstis reportedly did not want to talk about that.

This investigator told Mr. Powers that information he had presented still did not explain why five former students of various ages and in different classes would make allegations of sexual abuse against him.  Mr. Powers then said when Ron Chaffee was a student at Austine School, he had a history of lying.  Mr. Powers said he tried to help Mr. Chaffee straighten out.  He further stated that Mr. Chaffee lied and made up stories about everything, including that his mother beat him and that he was sexually abused.  Mr. Powers said William Werden worked for him for several summers but only came to his house one time.  This was when he and his wife moved from Keene, NH to Gilsum, NH.  His stepson, Stan, Mike Taylor and Mike Carter also helped with the move.  Mr. Powers described Chris Perreault as someone who tended to fantasize.  Mr. Powers further stated that Arthur Challis and Chris Perreault were in the same class in school.  Mr. Powers further described William Werden as "easily swayed and led."  He said William Werden is friends with Lyman Lawyer and with Mike Palmer and that he had fired Lyman for fooling around with and touching students on the bus.  Mr. Powers stated that Arthur Challis' mother and Steve Mosher are friends and

33

000034

A 2479

both of them are in debt and trying to get money. Mr. Powers complained that they were trying to make it look like he was responsible for the trouble Arthur Challis had gotten into. Mr. Powers also indicated that he thinks there is a connection between Dominick Bonura and hard feelings he has about the situation that occurred with his daughter. Mr. Powers complained that the Bonura children, Nancy and Tony, now are both working at the Austine School.

Mr. Powers further complained that Jimmy Challis and Dominick Bonura have been the "spearheads" to the investigation and that both of them have had "axes to grind." Mr. Powers then said that he was told by people that Dominick Bonura raped three girls when he was a staff person at Austine School. Mr. Powers said he had not heard this from the alleged victims. Mr. Powers then told about a situation that occurred with Dick Bonura, Dominick's brother, in 1990. Dick Bonura had been a staff person who had been asked to leave. After he left employment with the school, two students turned up missing. When they later returned, they were both intoxicated. The girl, named Laura, was hysterical. The boy, Wayne Erickson, said they had been given alcohol at Dick Bonura's apartment and that Dick had sex with Laura in the bathroom. Mr. Powers said he wanted to report the matter to the police, but that Mr. Stevens said "no" due to concerns about Dominick Bonura, who was on the school board. Mr. Powers said that the Bonura family later found out that he knew about the situation and Mr. Powers indicated that there may be a connection to William Werden and the allegations he has made. Mr. Powers also said that Alex and Nancy Bonura were contacted by Jimmy Challis who asked them for telephone numbers of former students so he could contact them to ask questions about abuse.

Mr. Powers then said that Jimmy Challis had a grudge against him concerning a hazing incident that he was involved with as a student. Mr. Powers said that Mr. Challis and seven other boys heated wire coat hangers with friction and burned another boy's back to make him a man. When the injury was discovered, Jimmy Challis was identified as being involved. He was initially suspended, but then was expelled. Consequently, Mr. Challis was not allowed to participate in the graduation ceremony and did not receive any honors. Mr. Challis had asked Mr. Powers to intervene on his behalf but Mr. Powers refused and Mr. Challis was very angry with him. Mr. Powers said Mr. Challis is still angry with him.

When asked about his past places of residence, Mr. Powers said he lived in Brattleboro at various locations starting in 1980. He first had an apartment on South Main St. and then moved to an apartment at the Brooks House. From there, he moved to the Brookside House and then to the Mountain Home Trailer Park. He gave the following names of students who visited him at his Brattleboro residences: His stepson, Stan; Mark Limoges, who visited off and on due to going away to college; Jimmy Clark; Steve

34

Regan; Creighton King. He said Arthur Challis, Steve Mosher, Ron Chaffee and Chris Perreault never visited these residences. In 1984, he met his wife and they were married in 1985. At that time, they moved to Keene, NH and from there moved to their current residence in Gilsum, NH. Mr. Powers said the only students who visited him in NH were Eric Putnam, Frank Baker and Luke Poquette. Mr. Powers also said he had an apartment on the school campus. Students were not allowed to visit in the apartment. He added that at one time, he had a room on campus that was part of an open unit in the high school dorm. His room was open until bedtime, at which point there was also a dorm supervisor present. He said Mark Limoges visited him there when he had that room.

When asked if he had ever received any treatment for sexual abuse of children, Mr. Powers said he had not. He further indicated that there would be no reason for him to participate in such treatment since he had not sexually abused any children.

On 12/19/96, this investigator contacted Dr. Ray Stevens, a former administrator at Austine School. Dr. Stevens indicated that he remembered Steve Mosher but did not recall any incident or problem reported by him concerning any staff person sexually abusing him. Dr. Stevens said he remembered Steve as a tough kid and thought Steve might have gotten caught doing something with a girl. Mr. Stevens further stated that sometimes students complained about how staff treated them or just griped about staff, but any report of sexual abuse would have been reported and investigated. Dr. Stevens then gave examples of people being dismissed in the past due to their behavior. He cited an example of a staff person bringing a student to his dorm room to show the student a pet snake. This person was immediately let go from employment. In another situation, a staff person had been dismissed for kissing a girl, and in a third example, he mentioned a staff person being dismissed due to one student reporting that the staff had gone into another student's room. Dr. Stevens said the biggest fear in any deaf school is staff sexually abusing students. He said the slightest suspicion would have resulted in a staff person's dismissal.

Dr. Stevens indicated that he was aware of the recent allegations of sexual abuse against Don Powers and said he was "totally shocked." When asked how he knew, Dr. Stevens said he had heard through the "grapevine." Dr. Stevens said he had heard that Steve Mosher made allegations of abuse and had said that he told administrators. However, Dr. Stevens denied this, saying he would have done something at the time. Prior to this recent allegations, Dr. Stevens had not heard any rumors or suspicions concerning Don Powers contact with children. However, Dr. Stevens also said that Don spent a lot of time with a lot of different students so he (Dr. Stevens) was very watchful. Dr. Stevens said that he and Mr. Lane sometimes talked together about all the time Don spent with children and they asked each other if either felt that something

35

was going on between Don and the children; however, they told each other no, this was not the case. Dr. Stevens further stated that he initially did not hire Don as Dean of Students due to his bad temper, his frequent tardiness and his poor paperwork skills. However, the second time Don applied for the position, he was hired. Dr. Stevens said he would not have hired Don if he thought abuse had occurred. In addition, Dr. Stevens said he had heard that others had come forward. He said he was surprised but that it was hard to believe that there was some conspiracy against Don.

On 12/19/96, this investigator contacted Richard Virkstis to confirm that Phil Tintendo, Andrew Cunningham and Cliff (last name unknown) are indeed no longer employed by Austine School. Mr. Virkstis confirmed that Mr. Tintendo and Mr. Cunningham do not work at the Austine School. Mr. Virkstis said he was not aware of their whereabouts, although he heard Mr. Cunningham was living somewhere in MA. Cliff was not a staff person that Mr. Virkstis knew of. Note: Jeffrey Rowland had previously told Mr. Virkstis that he had sexual contact with a staff person named Cliff. See SIU case file for written documentation of their conversation. Mr. Virkstis said he would inform this investigator if he learned more about these former staff people.

Mr. Virkstis said that on 12/18/96, he was contacted by Rene Pellerin. Mr. Pellerin informed him of contact Don Powers had with a woman named Barbara Wagner. Mr. Virkstis understood this person is an interpreter. Mr. Virkstis further stated that his understanding is that Don made some kind of threat about a counter suit. Mr. Virkstis did not have any details. Note: See SIU case file for a transcript of a TTY conversation between Don Powers and Barbara Wagner. Ms. Wagner gave this transcript to Rene Pellerin who then gave it to Supervisor George Karson. In summary, the transcript documents Mr. Powers' attempt to have Ms. Wagner talk with Ron Chaffee about the seriousness of his allegations and to ask him to carefully consider his actions. Mr. Powers also mentioned that he could take legal action against Mr. Chaffee.

On 12/23/96, this investigator contacted Richard Virkstis to obtain dates of birth and years of graduation for the 5 identified victims. Because of William Werden's current age (24 years old), Mr. Virkstis questioned why criminal charges had not been brought in his situation. Mr. Virkstis expressed concern over the deaf community's perception that Don had not received any consequence for his behavior since no charges had been filed. We discussed jurisdiction and this investigator informed Mr. Virkstis that the matter involving William Werden had been referred to the New Hampshire police, since that is where the abuse occurred. Mr. Virkstis said when he met with William Werden, Mr. Werden told him the abuse had occurred at Don Powers' home in West Brattleboro.

Mr. Virkstis also wanted this investigator to know that an alumni told him that another alumni who used to be president of the

36

000037

A 2482

alumni association went Susan Sien 4 or 5 years ago with complaints or concerns about Don Powers when this alumni was a student. Mr. Virkstis said he did not know any details and did not know if this alumni was a victim or only had information.

As follow up to our previous conversation, Mr. Virkstis said he had an address for Andrew Cunningham and he believed he works in a bookstore. Mr. Virkstis said he did not know if Phil Tintendo or Cliff currently worked with children.

On 12/24/96, this investigator contacted Don Powers through TTY transmission for the purpose of obtaining more information about his report of possible sexual abuse of a student named Laura by Dick Bonura. See write up of previous interview with Don Powers, dated 12/5/96.

Mr. Powers provided the following information: Laura's last name was Lunderbills and he believed she was actually a resident of Burlington, Vermont. At the time, Laura would have been 15 or 16 years old, so he believes she is now 21 or 22 years old. Dick Bonura was living on Indian Street or Road in Hinsdale, NH at the time of the alleged incident. Laura did not make a statement and was described as uncooperative. Another student, Wayne Erickson, told what happened between Laura and Dick Bonura. This investigator informed Mr. Powers that this information would be referred to the police and that the police may contact him if need be. See SIU case file for TTY transcript dated 12/24/96.

On 12/27/96, this investigator contacted Sergeant John Dudek of the Hinsdale, NH Police Department to inform him of the report of possible sexual abuse of Laura Lunderbills by Dick Bonura. Sergeant Dudek said he would look into the matter; however, in order to bring charges, he will need to track down the witnesses and get a statement from the alleged victim.

On 12/30/96, this investigator was paged by Richard Carroll, attorney for Don Powers. Mr. Carroll wanted this investigator to know that Mr. Powers was scheduled to take a polygraph examination on 1/10/97. Mr. Carroll asked this investigator to postpone the completion of my report so the polygraph results could be included. This investigator told Mr. Carroll the polygraph results could be written in an addendum to the report.

Mr. Carroll further stated that he had met with Mr. Powers prior to contacting me. Mr. Powers told him that he and Mark Limoges went to where William Werden works at the Hinsdale Race Track and questioned him. According to Mr. Powers, Mr. Werden denied that he said he had been abused. Reportedly, Mr. Werden said Richard Virkstis had called him to his office and told him that Don had abused others and asked him if Don had abused him, as well as asked what happened. Apparently, Mr. Werden also told Don that Mr. Virkstis told him he should talk with the police and with

37

SRS.  Mr. Carroll indicated that he was planning on interviewing William Werden and asked if I wanted to be present.  This investigator told Mr. Carroll I would advise my supervisor of his plan.  This investigator also said I did not believe I would be sitting in on his interview although I may interview Mr. Werden again.

CONCLUSION:

Based on information gathered during this investigation, there is accurate and reliable information that would lead a reasonable person to believe that Don Powers sexually abused Arthur Challis, Steve Mosher, William Werden, Ron Chaffee and Chris Perreault when they were students at the Austine School and he was serving in a caretaker role.  Although Mr. Powers denied the allegations against him and intimated that there is a conspiracy against him for various reasons, it does not seem believable to this investigator that five former students, all of different ages who attended Austine School at different times and who currently live in different parts of Vermont as well as outside of Vermont and others, would make false allegations of sexual abuse as part of a conspiracy to remove Mr. Powers from his position at Austine School.  Due to Mr. Powers' history of abuse, as documented in this report and because he has not received any treatment to address his sexual offending behavior, Mr. Powers, when employed by the Austine School, posed a substantial risk of harm to the students.

_____

Approval
George Karson
Special Investigations Unit Chief


c:    John Swartz, District Director, Brattleboro
      Linda Kapuscinski, Assistant Operations Manager
      Paul Hager, Residential Licensing Chief
      Dana Lawrence, Residential Services Coordinator
      Dan Davis, Windham County State's Attorney
      Detective Rick Andrews, Brattleboro Police Department

000039

A 2484

EXHIBIT C



Plaintiff's Exhibit IS
59
Schaffer. Dfd
12·18·02    T. Violette

## ADMINISTRATION MEETING

May 15, 1996

Present: Susan Sien, Kathy Gent, Will Verbits, Dick Virkstis, Brenda Fraenkel

Minutes:

**LLOYD:** Discussion began with Kathy reporting concerns regarding Lloyd and his lack of motivation to do his job. There are clearly areas where he is not taking care of his responsibilities. He blatantly is not working. He has been observed being downstairs doing crossword puzzles, taking lengthy coffee breaks, sitting in the hall reading the newpaper and refusing to work/help out when asked.

**CRISIS:** Susan reported we had a crisis meeting today concerning Steve Casella and Pat Rosenburg. Ina picked up from one of the students (Sara C.) that there was suspicion that Pat and Steve were having sexual relations, starting last spring. Pat did reveal last night at Susan's house with Ina that he and Steve had engaged in sexual activity. According to Susan, the police were called and interviewed Pat and Steve (Laurie Meyer came to interpret). Pat's mom was called and he went home. Also, it was discovered that there was inappropriate sexual contact between Steve Casella and Chris Tester, Wayne Betts, and Pat Rosenburg which allegedly started last spring. Since Steve Cassella has been allowed to returned to Austine (after the allegations of (2) rapes), Pat and Steve have had inappropriate sexual contact twice most recently, Monday night. Susan reported that Ina interviewed Wayne Betts and he said it was only touching on the butt. Pat and Chris Tester reported there has been horseplay/wrestling where touching of genitals happens. Pat Woodard and Josh Kimber denied any contact. The girls will be interviewed as well (Shellene Johnson, Sara Cater, Erin Staley and Rebecca Ellis). Susan stated Steve was sent home and will not be allowed to return to Austine. He was very upset and broke down crying.

Dick asked why Steve Casella was allowed to return to school and how did we try to protect students? Susan reported he came back with a one-to-one aide. Dick stated it doesn't look good that we allowed him to come back. Kathy asked who was the aide? Susan reported the aide was only for after school. Will questioned why Steve returned to school with an one-on-one at night if the alleged rape between Steve and Vanessa happend during school hours. Susan said where was Vanessa's one-to-one. Susan stated this sexual contact between Steve and Pat happened at night around 12:00 AM in the bathroom. The supervisors are supposed to be walking around every ten minutes. Dick stated the SRS investigation was still going on and wasn't completed and we probabaly shouldn't have had Steve come back.

A 3059

000613

Page 2

Gary C. moved that Dom should make changes to secure the campus at a cost of no more than $4500. Grace seconded and all approved.

Dom shared his view of the search committee and advised bringing Warren Schwaab, Gertie Galloway, Joe Fishgrund, and Jay Ines to facilitate developing a list of potential candidates for the new Executive Director. The list of potential candidates will be derived from advertising as well. The candidates would meet with seven groups. One representative from each group will recommend three people to the Board.

Groups are as follows:
1. Parents
2. RA's
3. Clinical services
4. Administration
5. Support services
6. Teachers
7. Alumni
8. Board of Directors

Meeting Adjourned,
Tami Mahurin

A 3060

D00612

EXHIBIT D

Patrick Schrader                                Vol. 1                      Kolash  v.
October 28, 2002                              pp. 1-253          Vermont Ctr. for Deaf

Page 181

[1] knowledge about this. I have no personal knowledge.
[2] Q: What have you heard?
[3] A: I don't — I don't think that's fair.
[4] Q: Mr. Schrader, it's not a question of what's
[5] fair and what's not fair. I need the information,
[6] and I recognize that you don't have personal
[7] knowledge. But I have a right to know what you
[8] know. Why was she asked to leave?
[9] A: Well, I'll tell you what the state told me
[10] before I came out here and took the job, because I
[11] called the State of Vermont. The State of Vermont
[12] told me because they were contemplating closing the
[13] school because of curriculum, lack of a curriculum
[14] and lack of abiding by special ed. regulations.
[15] Those are the two reasons they gave me, because
[16] we're state approved, and we have to go through the
[17] process every few years with them.
[18] MR. VAN DYCK: Could you repeat the
[19] witnesses answer for me?
[20] (Answer read back).
[21] Q: Did you ever hear from anyone else
[22] concerning the circumstances of Ms. Sign's
[23] departure?
[24] A: I checked it out, yes.

Page 182

[1] Q: Who did you check it out with?
[2] A: Other superintendents of deaf schools around
[3] the country for one thing.
[4] Q: What did you learn?
[5] A: I learned of problems.
[6] Q: What problems did you learn of?
[7] A: Just poor supervision of staff, lack of
[8] implementing policies, that kind of thing.
[9] Q: Did you learn anything else as a result of
[10] those discussions?
[11] A: All that comes to my mind is it was kind of
[12] a sad situation, let's put it that way. To this day
[13] I have trouble talking about it. It was just a sad
[14] situation. There were a lot of people — well, I'll
[15] just give you this quick example. I was interviewed
[16] by seven committees for this job. All seven
[17] committees were in tears. All seven committees just
[18] wanted to know if I could save them, save the
[19] school. That was my interview. Different than I'd
[20] ever faced before.
[21] Q: Did you learn of any particular problems
[22] with respect to staff relations with students?
[23] A: Rumors. Nothing that I, you know, yeah.
[24] Q: What rumors?

Page 183

[1] A: Rumors of poor supervision and ignoring
[2] policies.
[3] Q: Well, I'd like you to be a little bit more
[4] specific with me, if you could. Did you learn, for
[5] example, of any issues concerning sexual harassment
[6] or sexual abuse? You have to say yes or no.
[7] A: Yes, yes.
[8] Q: What did you learn?
[9] A: I just learned that there were people
[10] accused of that kind of thing, and that it wasn't —
[11] as I said, they didn't enforce the policies to take
[12] care of it. That's what I learned.
[13] Q: Who were the people that were being accused
[14] of it?
[15] A: Well, Don Powers, Susan Sign.
[16] Q: Anyone else?
[17] A: Those are the two names that I —
[18] Q: So Don Powers was being accused of molesting
[19] students at the school?
[20] A: (Witness nodded).
[21] Q: And Susan Sign was being accused of
[22] molesting students at the school?
[23] A: No, she was being accused of not taking care
[24] of it, not implementing the policies, not taking

Page 184

[1] care of it.
[2] Q: Anyone else that you're aware of who was
[3] being accused of sexual molestation?
[4] A: Not that I'm aware of.
[5] Q: Does the name Albertson ring a bell with
[6] you, Steve Albertson?
[7] A: Yeah, I think — jeepers. That's an
[8] employee name, is it?
[9] Q: I'm tired, but I think he's the employee.
[10] A: If I recall, I think it's the same guy. If
[11] I recall when I got there, he was accused of
[12] something that was later proven not to be true,
[13] proven not by me, by you guys, lawyers and stuff.
[14] Q: What were the accusations that were being
[15] made by Don Powers? Did it involve pedophilia?
[16] A: Yeah.
[17] Q: Young kids, correct?
[18] A: All ages.
[19] Q: Were they boys or girls or both?
[20] A: Boys mainly, that I'm aware of.
[21] Q: Did those accusations, was there any
[22] resolution to those accusations?
[23] A: No.
[24] Q: So to this day those accusations, we still



EXHIBIT E



# AUSTINE

## STUDENT LIFE PROGRAM STAFF EVALUATION

☑ **First Evaluation**   ☐ **Second Evaluation**   ☐ **Third Evaluation**

**Name:** John ReKhop

**Assignment:** High schol boy stft

**Date:** November 29, 996

A 1730

**Austine School for the Deaf/Hard-of-Hearing**
120 Maple Street  Brattleboro, Vermont 05301-2694  Voice/TTY: 802-254-4571  Fax: 802-254-3921

E



# AUSTINE

## STUDENT LIFE STAFF EVALUATION FORM

O = Outstanding  S = Satisfactory  NI = Needs Improvement  U = Unsatisfactory

**DORMITORY MANAGEMENT:**

|  | O | S | NI | U |
|---|---|---|---|---|
| **Planning and Preparation** | | | | |
| -with HSDAs, set realistic goals and objectives; establishes logical priorities | ☐ | ☐ | ☑ | ☐ |
| -shows evidence of proper use of available resources | ☐ | ☐ | ☑ | ☐ |
| -recognition of and provision for individual differences | ☐ | ☐ | ☑ | ☐ |
| **Motivation of Activities** | | | | |
| -demonstrates respect for students through fair and consistent attitude | ☐ | ☐ | ☑ | ☐ |
| -demonstrates high/appropriate expectations for student behavior | ☐ | ☐ | ☑ | ☐ |
| -appropriate student behavior is clearly defined, communicated to students and consistently monitored | ☐ | ☐ | ☑ | ☐ |
| -with regard to discipline, students are treated in fair, firm and consistent manner, taking individual needs into account | ☐ | ☐ | ☑ | ☐ |
| -develops state of readiness of activities | ☐ | ☐ | ☑ | ☐ |
| -creates an awareness of need and purposes for the activity | ☐ | ☐ | ☑ | ☐ |
| -encourages participation through positive reinforcement and appropriate praise | ☐ | ☐ | ☑ | ☐ |
| -holds attention of the students in the group | ☐ | ☐ | ☑ | ☐ |
| -generates enthusiasm through discussion using students' ideas and suggestions | ☐ | ☐ | ☑ | ☐ |

A 1731

Austine School for the Deaf/Hard-of-Hearing
120 Maple Street  Brattleboro, Vermont 05301-2694  Voice/TTY: 802-254-4571 Fax: 802-254-3921

2

- **Action**

| | O | S | NI | U |
|---|---|---|---|---|
| -appropriate use of students' guidelines | ☐ | ☐ | ☑ | ☐ |
| -control, but not in domination of the group | ☐ | ☐ | ☑ | ☐ |
| -is consistent in dealing with similar situations | ☐ | ☐ | ☑ | ☐ |
| -assists with individual homework assignments | ☐ | ☐ | ☑ | ☐ |
| -keeps track of students' whereabouts | ☐ | ☐ | ☑ | ☐ |
| -uses a variety of materials and activities | ☐ | ☐ | ☑ | ☐ |

- **Use of Physical Facilities**

| | O | S | NI | U |
|---|---|---|---|---|
| -orderliness of dormitory areas | ☐ | ☐ | ☑ | ☐ |
| -effective use of displays, posters, maps, ect. | ☐ | ☐ | ☑ | ☐ |
| -uses bulletin board(s) appropriately | ☐ | ☐ | ☑ | ☐ |
| -shows respect for equipment and materials | ☐ | ☐ | ☑ | ☐ |

## PERSONAL QUALITIES:

- **Initiatives**

| | O | S | NI | U |
|---|---|---|---|---|
| -completes assignments | ☐ | ☐ | ☑ | ☐ |
| -volunteers for additional responsibilities | ☐ | ☑ | ☐ | ☐ |

- **Dependability**

| | O | S | NI | U |
|---|---|---|---|---|
| -can be depended upon at all times to carry out designated responsibilities; even in an emergency | ☐ | ☐ | ☑ | ☐ |
| -accurately performs assignments within the scope of job requirements | ☐ | ☐ | ☑ | ☐ |
| -maintains satisfactory records of attendance | ☐ | ☑ | ☐ | ☐ |
| -displays good judgment | ☐ | ☐ | ☑ | ☐ |

- **Punctuality**

| | O | S | NI | U |
|---|---|---|---|---|
| -arrives to work on time and leaves at appropriate time | ☐ | ☑ | ☐ | ☐ |
| -gives ample advance notice of absences or personal days needed | ☐ | ☑ | ☐ | ☐ |
| -always punctual in handling assignments and submitting reports | ☐ | ☐ | ☑ | ☐ |
| -keeps logs and records up to date | ☐ | ☐ | ☑ | ☐ |

- Communication and Cooperation with Other Staff

| | O | S | NI | U |
|---|---|---|---|---|
| -works effectively with other SDAs | ☐ | ☐ | ☑ | ☐ |
| -communicates adequately with partner and fellow SDAs | ☐ | ☐ | ☑ | ☐ |
| -shares ideas and professional information with fellow SDAs, HSDAs, teachers, and/or administrators | ☐ | ☐ | ☑ | ☐ |
| -is receptive to other people's viewpoints | ☐ | ☐ | ☑ | ☐ |
| -recognizes and supports departmental and school objectives | ☐ | ☐ | ☑ | ☐ |

- Communication Skills

| | O | S | NI | U |
|---|---|---|---|---|
| -is effective in use of a variety of communication skills | ☐ | ☐ | ☑ | ☐ |
| -is able to understand any students | ☐ | ☐ | ☑ | ☐ |

- Attitude Toward Students

| | O | S | NI | U |
|---|---|---|---|---|
| -demonstrates appropriate adult role modeling | ☐ | ☐ | ☑ | ☐ |
| -provides a friendly, warm atmosphere | ☐ | ☑ | ☑ | ☐ |
| -knows each student as an individual | ☐ | ☐ | ☑ | ☐ |
| -shows tact, patience and consideration in dealing with students | ☐ | ☐ | ☑ | ☐ |
| -gives praise to students as positive reinforcement | ☐ | ☐ | ☑ | ☐ |
| -is fair and impartial | ☐ | ☐ | ☑ | ☐ |
| -develops mutual respect and tolerance | ☐ | ☐ | ☑ | ☐ |

- Acceptance and Criticism

| | O | S | NI | U |
|---|---|---|---|---|
| -accepts suggestions and criticisms | ☐ | ☐ | ☑ | ☐ |
| -cooperates in effort to improve performance in a positive manner | ☐ | ☐ | ☑ | ☐ |

- Personal Growth

| | O | S | NI | U |
|---|---|---|---|---|
| -has thorough, detailed knowledge of policies and procedures | ☐ | ☐ | ☑ | ☐ |
| -is open to learning | ☐ | ☐ | ☑ | ☐ |
| -attends in-service meetings | ☐ | ☑ | ☐ | ☐ |
| -participates in staff meetings | ☐ | ☑ | ☐ | ☐ |
| -seeks advice & guidance from fellow professionals | ☐ | ☐ | ☑ | ☐ |

A 1733                4



**AUSTINE**

Comments From Head Student Development Advisor:

John does a good job as SDA as general and he does show up on time and communicate with me about his absent or sick leave. He helps put visual things on High School boy dorm wall. He has lot of potential in his future but some areas that he needs to improve are: planning head of time with approval; set up goals and plan for students; showing on time prepared; participation through positive reinforcement and appropriate praise; know staff's policies and procedure; read student's guideline; dealing with similar situations; maintain control students in dining hall; incident reports within 24 hours; timecard on time; professionalism in behavior; keep communication what's happening around students; ask for advice or guidance from others; and complete assignment.

Response From Student Development Advisor:

Recommended to Return School Year _____

Not recommended to Return School Year_____

_____
Head Student Development Advisor

_____ 12/20/96 _____
Student Development Advisor

A 1734

December 19, 1996

To:  Alana Olson, Director of Student life

Fr:  Nancy Bonura, Head Student Development Advisor

Re:  Evaluation / Outstanding


I would like to enclose this in my file for record; that you and I had discussed the matter about removing "outstanding" from the evaluation form.  I strongly, personally feel "outstanding" will prevent the possibilities of improving abilities from the staff.  Insteading of using "outstanding", I suggest using the term of "satisfactory" in the evaluation form.


cc Pat  Schrader, Headmaster
      Personnel File

A 1735



# AUSTINE

December 20, 1996

To: John Rekhop
    Student Development Advisor

From: Alana D. Olson
    Director of Student Life

Re: Handing in his time card late

This letter is a follow up on our meeting today, December 20, 1996 in my office. We discussed on your chronic handing in your time card late to Nancy Bonura, your Head SDA. You understand that next time if and when you hand in late, Nancy will not make any effort to get it to the Business Office on time and this may result your missing the next paycheck.

cc: Nancy Bonura
    Pat Schrader
    Personnel File

A 1736

# EXHIBIT F



May 7, 1997

## Meeting Minutes

**Attending:** Alana Olson, Pat Schrader, Ina Schaeffer, Dolph Rekhop

**Interpreter:** Virginia Husted

Alana began by stating that the reason for requesting the meeting today was because last Sunday (May 4, 1997), S.T. came to her office, upset and said she needed to talk about something that had happen on the previous Friday (May 2, 1997) on the bus riding home. S.T. stated that Dolph asked her if she had lost her virginity. S.T. stated that she said it was none of his business. Then she stated that Dolph made a kissing face and she began to cry. Alana asked S.T. if there were witnesses she said one student.

Alana stated that these were serious allegations and contacted Pat. Pat advised her to ask the students if they were willing to make written statements. They agreed and made written statements that they signed. At that time, Austine had no other choice in accordance with the Austine policies and procedures but to put Dolph on administrative leave to have an opportunity to investigate the situation further.

Alana stated that after she had gathered sufficient information she asked Dolph to meet here today to share his side of the story. Alana also state she has a copy of the incident report as written by Dolph.

Dolph then asked if S.T. had told Alana more because there were parts of the story missing and facts were confused. Dolph asked if S.T. stated that she brought up the issue with Dolph that she was raped. Alana said that S.T. did not say this to her.

Dolph asked if S.T. had told Alana about Dolph's marrying his girlfriend and having the baby live with them. Alana said no S.T. did not say that. Dolph stated that S.T. constantly raises this subject with him.

A 2094

Dolph stated that on Friday he agreed to be a substitute supervisor on the bus taking students home. D. T. was at that time having difficulty so he was asked to keep a close eye on D.T. When the younger kids were dropped off the bus D.T. asked Dolph if he could to move to the front of the bus. Dolph asked other staff on the bus and they said it was OK. D.T. and Dolph then moved to the front of the bus. B.B. had hurt himself and Dolph took care of this and made sure everything was OK. Then S.T. brought up the issue of Dolph getting married in the future. Dolph did not want to discuss this issue again with S.T. (she frequently questions him about his relationship with his girlfriend). Dolph simply nodded in response. Another staff member saw this. Then Dolph asked S.T. if everything was going OK with D.N. She said fine and asked if Dolph knew that she was raped. Dolph stated he asked S.T. if she reported this and she said yes. Then she went on to tell Dolph about the rape. Dolph state he did not want to know about it but listened. Then Dolph asked S.T. if she knew the difference between rape, sex and harassment. S.T. said no so Dolph tried to explain to her the difference between rape, sexual harassment.

Alana stated that through her investigation she had talked with Rebecca Hilding and John Fish. Now with Dolph's statements she feels that Dolph did not do anything inappropriate and felt that S.T. may be exhibiting Post Traumatic Stress Syndrome, confusion, and needs to see a counselor. Ina asked how Alana knows that S.T. suffers from Post Traumatic Stress Syndrome, and Alana stated that this was a possibility. Alana stated that Dolph has done a very good job and has been professional in all aspects of his job. Dolph stated that he did not ever talk to S.T. about virginity.

Alana then stated that we would like Dolph to come back to work. Dolph asked if the charges will be dropped. Pat stated that there never were any charges made by Austine. A female student made accusations. We had no choice but to put Dolph on administrative leave once the student and student witness had made written statements from the students. Alana stated that she talked with S.T. this morning and S.T. said she would feel comfortable having Dolph come back to work.

Dolph stated that he feels now that he should have documented more about S.T.'s constant approaching him and asking him about marrying his girlfriend.

2

A 2095

SEP 17 '02 11:03 FR ASTINE SCHOOL    802 254 3921 TO 9 8801580-957 P.04/10

Dolph also said that S.T. had stated that when she turned 18 she and he could go out together.

Dolph stated that since the phone call from Alana stating that he needs to stay home it has been very emotionally upsetting for him. He has not been eating or sleeping well and this has been a knot in his stomach. He feels that he has been stabbed in the back. He did not do anything to deserve this feeling.

Pat stated that life is not fair sometimes and that for himself as a male teacher he realized that he had to be very careful. He will never get into a discussion about marriage, having babies or sex with a student. Young girls are becoming young women and they like Dolph. He is popular and boys and girls like him. Some girls will like him and have feelings for him.

Pat stated that Austine never accused Dolph of anything. We have to protect our students. If a student makes a written statement, we must investigate and put the staff member on administrative leave. Pat said that he had similar experiences as a male teacher and sympathizes with Dolph's position.

Ina reiterated that Austine never accused Dolph of anything. Alana has to do her duty. Ina stated she sees this as a situation for staff training stating that many of our students don't understand about boundaries and Dolph became a victim because he was trying to help. Ina thinks both staff and students need training on boundaries.

Dolph shared his opinion that S.T. needs some help and needs to see a counselor. Alana stated that S.T.'s parents have been contacted and Alana will further recommend they set up counseling with an outside female counselor who is Deaf.

Pat felt that S.T. should apologize to Dolph. Alana stated that S.T. still insists that Dolph did say this but she feels comfortable having Dolph come back. Ina stated that Sam has a history of forcing people to back her up (i.e. her witness) and she also has a learning disability and mixes things up.

3

A 2096

Alana stated that students come here with a wide variety of backgrounds and confusion over boundaries. Adults working with these students have to be careful. Dolph asked that if it was the role of the SDA to teach the children. Alana suggested that teaching about sex and harassment should be referred to the counselor. Pat stated that today's world is a lot more free and sex is often a topic with younger children. They get confused and the sign sex may have many different meanings to children. Pat suggested that any issues related to a girls body, sex, babies, etc. should be referred by SDA's to Alana, Ina and/or Joyce.

Dolph stated that he feels awkward coming back and feels shamed. Pat stated that every adult he talked to supported Dolph and respects him as an employee and many people came to Pat especially to tell him about this and they also know S.T. and her history.

This is not and simple issue and you are hurt inside. Pat stated he thinks the best things for Dolph to do is to come back and be with the kids and staff who appreciate him.

Ina asked how Dolph should react with S.T. Dolph said he would prefer to have other staff around when he has contact with her. Pat asked that some one from the counseling department should talk to S.T. and S.T. should apologize or recognize that she needs to learn from this situation. Alana stated that she will suggest the parents seek outside counseling. Alana stated that there is nothing in Dolph's personnel file regarding this incident and Alana stated that her files are not permanent and will be destroyed.

Pat stated that he has never heard a complaint about Dolph and he is a very good employee and if there is anything else that Dolph would like to discuss please come to see him or Ina. If S.T. does anything inappropriate Dolph should go to Rebecca (if it happens in the school) or Alana (if it happens in the dorm). Pat stated that when Dolph goes back to work it may be a little hard for a few days but he is 100% welcome back to Austine and he is a very good employee. Suggestions were made to focus on the kids that Dolph works with.

Dolph asked to return to work tomorrow to give himself time to get himself back together. Pat and Alana stated that this would be OK.

4

A 2097